In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00134-CV


______________________________




JACK BESTEMAN AND PAM BESTEMAN, Appellants



V.



JERRY PITCOCK AND JOANNE PITCOCK, Appellees




 


On Appeal from the 62nd Judicial District Court


Lamar County, Texas


Trial Court No. 75422




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 About two months after Jack Besteman and his wife, Pam, acquired a called 235-acre tract
of land in Lamar County as part of a like-kind exchange for property they had owned in another state,
the Bestemans were approached by Jerry Pitcock and his wife, Joanne, who wanted to buy it. Jack
Besteman refused to sell it to the Pitcocks in an outright sale, indicating that he would only agree to
part with it if it could be achieved through a similar like-kind exchange of the manner he had just
experienced, thus saving substantially on taxes which would otherwise be incurred. As a vehicle to
facilitate this, Besteman insisted that the Pitcocks enter into a lease of the property for two years with
an option to purchase at the termination of the lease agreement. Besteman explained this delay by
indicating that he wanted an opportunity to locate available apt real estate which could be used to
effect such an exchange.

 Besteman drafted a lease/option agreement by which the Pitcocks would pay the Bestemans
$11,675.00 per year for two years and, at the expiration of the lease term, could exercise the option
to purchase the property at $950.00 per acre (i.e., $223,250.00). The general form of the lease/option
agreement was drawn heavily from one which the Bestemans had used in the past in another
transaction. It contained clauses that required maintenance of the pastures and improvements in
accord with good husbandry of the land and dictated that any addition or removal of improvements
on the land could only be done with the approval of the Bestemans. A condition precedent in the
contract to the Pitcocks' right to purchase was stated as follows: "90 days before the 24 month lease
period expires, Lessee will notify Lessor of Lessee's intent to purchase said property." The twenty-four-month lease period was set to expire on September 20, 2006. The lease agreement also
specified that:

 Any notice required, or permitted to be delivered hereunder must be in writing, and
all notices and payments of rent will be deemed received on the date they are
deposited in the United States mail, certified mail or registered mail, postage prepaid,
return receipt requested, addressed to Lessor or Lessee, as the case may be, at the
address shown above, or at such other place as the Lessor or Lessee may from time
to time designate by written notice as provided in this paragraph. Notices delivered
otherwise will be effective upon receipt.


 It is uncontroverted that no written notice of an intention to exercise the option to purchase
was given by the Pitcocks to the Bestemans at least ninety days before the expiration of the lease
agreement term.

 The Pitcocks went into possession of the tract of land under the lease agreement and made
timely payments of the lease installments. However, they failed to provide any written notice of their
intention to exercise the option to purchase until some forty-nine days after the time specified in the
contract. When the Pitcocks did send written notice by certified mail, it was not retrieved by the
Bestemans and the notice was returned, undelivered. 

 Almost immediately after the notice was returned to them, the Pitcocks filed suit for specific
performance, declaratory judgment, and breach of contract. In their petition, the Pitcocks alleged
that they had provided unequivocal notice of their intention to exercise the option to purchase well
before the required time and that they had, in reliance upon the option to purchase, invested
substantial sums in improving the property. The Bestemans responded with a request for an award
of reasonable rentals from the time of the termination of the two-year lease until the time of recovery
of the property from the Pitcocks. Both parties requested attorneys' fees pursuant to Sections 37.009
and 38.001 of the Texas Civil Practice and Remedies Code. 

 The Pitcocks maintain that although the contract states that all notices required under the
agreement be in writing and delivered by certified mail, the paragraph concerning notices ends with
the statement that "Notices delivered otherwise will be effective upon receipt." The Pitcocks insist
that since the contract permits notices to be delivered "otherwise," that means that the notice could
be delivered orally rather than in writing; in other words, the Pitcocks say that they effected notice
by oral communication and that this was sufficient notice to invoke the option to purchase.

 The Pitcocks also rely upon the equitable doctrine of disproportionate forfeiture (defined
later) as a defense against the claims that they failed to conform to the ninety-day notice requirement.

 In a trial to the court at which only Jack Besteman and Jerry Pitcock testified, the testimony
was somewhat controverted as to the efforts made by Pitcock to orally communicate the intention
to exercise the option to purchase. 

 Pitcock testified that he had attempted unsuccessfully on a number of occasions to reach
Besteman by telephone and had tried on one occasion to find him at home, all with the intention of
communicating his intention to exercise the option to purchase; Pitcock further said that on the
occasion of paying the annual rent, he had requested that he be allowed to simply complete the
purchase at that time rather than waiting the additional year; and that on another occasion, he had
attempted to persuade Besteman to terminate the lease by completing a sale of the property. Pitcock
testified further that the course of his actions on the property by improving the ponds, clearing of
underbrush, the construction of a concrete pad as a horse-washing area, and fertilizing the property
was evidence of the intention of the Pitcocks to exercise their option to purchase, this evidence being
tantamount of notice of their intention to purchase. However, on cross-examination, it was shown
that the $15,000.00 statement which was presented as evidence of the Pitcocks' investment in
clearing the property was from Joanne Pitcock's father, and the Pitcocks were unable to particularize
the services which had been performed and indicated that these services were not paid for in cash. 
Pitcock also admitted that fertilization of the property was a part of good husbandry of the property
(although he indicated that he would not have fertilized as much had he not believed he would be
able to purchase), that some of the billing statements he presented were for work done on other
property, and that the oats which had been sown were to feed deer and the oats provided benefits
only during the term of the lease.

 Besteman responded by indicating that he was not difficult to reach by telephone and he
indicated doubt that someone would be unable to find him (or someone in his family) at his house
as Pitcock had testified, that he had no recollection of Pitcock's expression of interest in purchasing
the property at the time Pitcock paid the second year's lease amount or any other time during the two-year term of the lease, that he was unaware of the actions taken by Pitcock on the property, and that
he had believed that the Pitcocks' desire to purchase the property was contingent on their ability to
sell their house (which continued to be for sale throughout the entire two-year term of the lease). 
Besteman also indicated that he erroneously believed that the certified-mail notice sent by the
Pitcocks had to do with a contested medical bill and that he was unaware that it was intended to be
a notice from the Pitcocks expressing their intention to purchase.

 The trial court then requested letter briefs from the parties. In the post-trial brief filed by the
Pitcocks, disproportionate forfeiture was first raised as a theory of recovery. (1)

 The trial court gave judgment in favor of the Pitcocks, ordering specific performance and
awarding attorneys' fees; the trial court also entered detailed findings of fact and conclusions of law. 
The Bestemans have perfected their appeal to this Court, raising three primary points of error (with
subpoints): (1) the trial court erred in granting specific performance relief, (2) the trial court erred
in six of the findings of fact and conclusions of law, stating that none of the six were supported by
evidence and that each was manifestly erroneous, and (3) the trial court erred in awarding attorneys'
fees to the Pitcocks.

 Although their brief indicates that the complained-of findings of fact and conclusions of law
are "without evidence to support" them and that they are "manifestly erroneous," the Bestemans do
not specify whether their challenge to the various findings of fact regard their legal sufficiency or
their factual sufficiency. 

 Questions of law are reviewed de novo. City of San Antonio v. TPLP Office Park Props., 218
S.W.3d 60, 66 (Tex. 2004). Questions of fact resolved by the trial court are subject to the same legal
and factual sufficiency standards as jury findings. In re Doe, 19 S.W.3d 249, 253 (Tex. 2000).

 The test for the legal sufficiency of evidence is "whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review." City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005). In making this kind of determination, the Court credits favorable
evidence if a reasonable fact-finder could, and disregards contrary evidence unless a reasonable
fact-finder could not. Id. So long as the evidence falls within the zone of reasonable disagreement,
the Court may not substitute its judgment for that of the fact-finder. Id. at 822. The trier of fact is
the sole judge of the credibility of the witnesses and the weight to give their testimony. Id. at 819. 
In determining a no-evidence issue, the Court is to consider only the evidence and inferences that
tend to support the finding and disregard all evidence and inferences to the contrary. Bradford v.
Vento, 48 S.W.3d 749, 754 (Tex. 2001); Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450
(Tex. 1996). 

 In contrast, when making a factual sufficiency review, the Court considers and weighs all the
evidence and will set aside the verdict only if the evidence is so weak or the finding is so against the
great weight and preponderance of the evidence that it is clearly wrong and unjust. Vickery v.
Vickery, 999 S.W.2d 342, 376 (Tex. 1999) (op. on reh'g); Pool v. Ford Motor Co., 715 S.W.2d 629,
635 (Tex. 1986); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).

 In the briefs filed with the trial court and on appeal, the Pitcocks rely upon a variety of legal
postures and equitable remedies, which rest upon varied factual findings and legal conclusions. 
Some of the findings or conclusions are necessary to some of the theories of recovery, but not others. 
These findings or conclusions include a conclusion that oral notification by the Pitcocks of their
intent to exercise the option sufficed, a conclusion that a failure to compel specific performance
would produce unconscionable results, a finding of accident or mistake in a failure to provide written
notice, a finding that a prospective purchaser was not in default in its obligations and had
substantially complied, and others. Because resolutions of the points of error raised by the
Bestemans rely heavily on an analysis of the accuracy and applicability of the findings of fact and
conclusions of law entered by the trial court, we have examined these points of error first so they can
be applied later to the other points raised on appeal. 

 The findings of fact and conclusions of law filed by the trial court are numbered together and
the findings of fact are not differentiated from the conclusions of law. Some of the individually
numbered items in the findings of fact and conclusions of law include both findings of fact and
conclusions of law.

I. POINTS OF ERROR RELATED TO FINDINGS OF FACT / CONCLUSIONS OF
LAW


 A. Conclusion that Oral Notice of the Exercise of the Option to Purchase Was
Sufficient


 The trial court's finding/conclusion number 20 states that "The oral notifications given by [the
Pitcocks] . . . were sufficient to comply with the . . . Notice Provision of the Lease, inasmuch as the
Notice Provision specifically provides in its last sentence that 'Notices delivered otherwise will be
effective on receipt.'" This portion of the trial court's finding of fact and conclusion of law presents
a question of law and is, therefore, reviewed de novo on appeal.

 1. General Rule: Strict Compliance

 It is a well-settled principle that strict compliance with the provisions of an option contract
is required. See Jones v. Gibbs, 133 Tex. 627, 130 S.W.2d 265, 271 (Tex. Comm'n App. 1939,
opinion adopted); Crown Constr. Co. v. Huddleston, 961 S.W.2d 552, 558 (Tex. App.--San Antonio
1997, no pet.). Except in rare cases of equity, acceptance of an option must be unqualified,
unambiguous, and strictly in accordance with the terms of the agreement. Crown Constr., 961
S.W.2d at 558 (citing Zeidman v. Davis, 161 Tex. 496, 342 S.W.2d 555, 558 (1961)). 

 In a concurring opinion, former Chief Justice Cornelius of this Court accurately explained
the nature of an acceptance of an option:

 An option is unilateral. It imposes no liability on the optionee unless and until he
exercises the option according to its terms. Acceptance of an option, unless excused
on equitable grounds, must be unqualified, unambiguous, and strictly in accordance
with its terms. Any failure to exercise an option according to its terms, including an
untimely or defective acceptance, is simply ineffectual, and legally amounts to
nothing more than a rejection. Consequently, an acceptance that does not comply
with the option's terms, unless it is accepted by the optionor, binds neither the
optionee nor the optionor. 

Atterbury v. Brison, 871 S.W.2d 824, 829 (Tex. App.--Texarkana 1994, writ denied) (citations
omitted) (Cornelius, C.J., concurring).

 Both parties concur that no written notice of the intention to exercise the option was
delivered by the Pitcocks to the Bestemans within the time frame specified in the contract. It is
necessary, then, to look to the agreement to determine whether the agreement allows for an
alternative means by which such a notice could be given.

 2. Relevant Terms of the Agreement

 As quoted before, the option paragraph of the contract says the Pitcocks were to notify the
Bestemans of their intention to exercise the option to purchase "90 days before the 24 month lease
period expires." Though not clearly outlined in the rather short provision of the contract, the parties
have read the language as requiring notice before the ninety-day period preceding the end of the two-year lease term. The final date that notice could be given under the contract was June 19, 2006.

 The general notice provision of the agreement is found as follows in paragraph 18:

 Any notice required, or permitted to be delivered hereunder must be in writing, and
all notices and payments of rent will be deemed received on the date they are
deposited in the United States mail, certified mail or registered mail, postage prepaid,
return receipt requested, addressed to Lessor or Lessee as the case may be, at the
address shown above, or at such other place as the Lessor or Lessee may from time
to time designate by written notice as provided in this paragraph. Notice delivered
otherwise will be effective upon receipt.


 3. Is the Notice Provision Ambiguous?

 Whether a provision in a contract is ambiguous is answered by looking at the entire contract
and giving effect to each provision. Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983). If a contract
is worded so that a court may properly give it a definite or certain legal meaning or interpretation,
then it is not ambiguous. Crown Constr., 961 S.W.2d at 556. A contract is ambiguous only when
there exists a genuine uncertainty as to which of two meanings is proper. Id. However, an ambiguity
does not exist simply because the parties advance conflicting interpretations of the contract. Forbau
v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994); Crown Constr., 961 S.W.2d at 556. In
order for an ambiguity to exist, both interpretations must be reasonable. Nat'l Union Fire Ins. Co.
of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995); Crown Constr., 961 S.W.2d
at 556.

 The Bestemans maintain that written notice of the intent to exercise the option was required
by the agreement. The Pitcocks seize on the final sentence of paragraph 18 and the use of the words
"delivered otherwise" as permitting oral notice of the intent to exercise the option in lieu of a written
notice. This interpretation would completely negate the first sentence of the paragraph, which
plainly states that all notices "must be in writing." Therefore, to give those words the meaning urged
by the Pitcocks would violate one of the principal tenets of contract construction.

 In construing a written contract, the primary concern of the court is to ascertain the
true intentions of the parties as expressed in the instrument. To achieve this
objective, courts should examine and consider the entire writing in an effort to
harmonize and give effect to all the provisions of the contract so that none will be
rendered meaningless. 


Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 662 (Tex. 2005) (citations omitted).

 It is plain that the "delivered otherwise" wording of the contract pertains to the manner of
delivery of the notice which (as is stated in another part of the contract) "must be in writing." To
find otherwise, the writing requirement would mean nothing. Impliedly, the trial court determined
that the contract was ambiguous; it is not. 

 We, therefore, determine that the court erred in its finding that the contract exculpated the
Pitcocks from delivering a written notice of their intention to exercise the option to purchase; in so
doing, we determine that under this contract, it was necessary to deliver a written notice of the
exercise of the option before the right to purchase under the contract was invoked. 

 B. Reliance on Principles Set Out in Farris v. Bennett's Executors, 26 Tex. 568
(1863) and Advanced Components, Inc. v. Goodstein, 608 S.W.2d 737 (Tex. Civ.
App.--Dallas 1980, writ ref'd n.r.e.)

 

 The Farris case set forth elements which tend toward specific enforcement of a contract
through the application of equity. The trial court's finding/conclusion number 26 accurately
summarizes those elements in stating that the person seeking specific performance was not in default
of its obligations and that it had substantially complied with the duties required under it. In Farris,
the Texas Supreme Court then determined that where there was not strict compliance with the terms
of the contract, the noncompliance did not go to the essence of the contract itself and, therefore, did
not bar the remedy of specific performance.

 In Advanced Components, the Dallas Court of Appeals excused strict compliance with the
terms of a contract to purchase in a situation in which (a) the proposed seller would, if the contract
were enforced, obtain the benefit which it reasonably anticipated when entering the contract; (b) the
proposed purchaser could not be adequately compensated in damages for the lack of complete
performance; (c) the proposed purchaser had completely performed its obligations pursuant to the
contract and made preparations for continued performance; (d) greater hardship would devolve on
the proposed purchaser than on the proposed seller if specific performance were not ordered; and 
(e) the motivation of the proposed seller in refusing to carry through with the purchase and sale was
found to be greed.

 However, neither of these cases is on point. In the Farris case, there was never any lease or
any option to purchase; rather, the parties had made an agreement for the purchase and sale of real
estate conditioned upon the purchaser performing certain conditions--conditions which were
substantially performed. In the Advanced Components case, although there had been an option to
purchase granted, the option had been duly exercised; the performance of the purchase was the thing
at issue. The law is clear in Texas that an option to purchase is a unilateral contract which does not
ripen into a mutually binding obligation until acceptance by the optionee. Kenver Corp. v. Robinson,
492 S.W.2d 317, 319-20 (Tex. Civ. App.--Beaumont 1973, writ ref'd n.r.e.); Leggio v. Millers Nat'l
Ins. Co., 398 S.W.2d 607 (Tex. Civ. App.--Tyler 1965, writ ref'd n.r.e.); Hankey v. Employer's Cas.
Co., 176 S.W.2d 357, 362 (Tex. Civ. App.--Galveston 1943, no writ).

 Until the time that the Pitcocks complied with the requirement that they give notice of the
exercise of their option to purchase, the substantial object of the contract between them and the
Bestemans was a pasture lease; the Pitcocks had the right of use of the property and possessed the
unilateral right to exercise the option to purchase. Had the Pitcocks given notice as under the
contract that the option to purchase had been exercised, it would have then transformed the unilateral
right to purchase into a bilateral contract for the purchase and sale; once a notice of the intention to
exercise the option was given, the substantial object of the contract would have been transformed
from the lease of the property to the purchase of it.

 The tenets set forth in Farris and Advanced Components both deal with contracts for the
purchase of land; they do not apply to options to purchase real estate. Accordingly, the
findings/conclusions numbered 26 and 27 are incorrect statements of the law as they apply to this
case. It was error, therefore, to apply the law in Farris and Advanced Components to the
circumstances of this case.

 C. Finding that the Pitcocks' Failure to Comply with the Option to Purchase was
Due to Mistake


 The trial court's finding/conclusion number 28 made the factual finding that "Any failure on
[the Pitcocks'] part to comply with the Option to Purchase was due at most to a mistake in what was
necessary." After a careful reading of the record, it is quite clear that although there was substantial
testimony regarding the Pitcocks' attempts to provide oral notification of their intention to exercise
the option to purchase, there was simply no evidence provided at trial for the reason that no written
notice was tendered. Although one might assume that this failure was due to an error and not
through contumacious disregard of that requirement, that assumption would be required in order to
arrive at the factual finding above. 

 As pointed out in Kroger Texas Limited Partnership v. Suberu, 

 A challenge to the legal sufficiency of evidence will be sustained when, among other
things, the evidence offered to establish a vital fact does not exceed a scintilla. 
Evidence does not exceed a scintilla if it is "so weak as to do no more than create a
mere surmise or suspicion" that the fact exists.


216 S.W.3d 788, 793 (Tex. 2006) (quoting Ford Motor Co. v. Ridgeway, 135 S.W.3d 598, 601 (Tex.
2004); Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)).

 Accordingly, we find that since there was no evidence introduced regarding the motivation
of the Pitcocks in their failure to provide the required written notice of their intention to exercise the
option to purchase, the evidence is legally insufficient to support this finding of fact. Therefore, we
sustain this point of error.

 D. Finding that the Pitcocks Made a Good-Faith Effort to Comply With the Terms
of the Lease and Were Not Guilty of Willful or Gross Negligence

 In its finding/conclusion number 29, the trial court made two findings of fact: (1) that the
Pitcocks had made a good-faith effort to comply with the terms of the lease and (2) that they were
not guilty of any acts which would amount to willful or gross negligence.

 Although the finding of a lack of willful or gross negligence does not specify what the
negligence would regard, we assume that it pertains to the Pitcocks' failure to provide a written
notice of their intention to exercise the option to purchase. 

 However, as pointed out above, although Pitcock testified about the oral communications he
had made regarding the intentions he had at the outset to purchase the land and the work he had
performed on the land, he never proffered an explanation for the reason for the forty-nine-day delay
in giving the required written notice he would need to deliver in order to exercise the option to
purchase. In order to arrive at the conclusion that neither willful nor gross negligence prompted the
failure to deliver the required notice, one must infer that from the conduct of the Pitcocks. Under
the circumstances of this case, this inference amounts to no more than a guess or a surmise. One
could just as easily infer that the Pitcocks were contumaciously and obdurately refusing to provide
a written notice as to infer that they were inadvertently doing so. 

 Had there been even a scintilla of evidence presented which supported the finding that the
Pitcocks were motivated by something which did not amount to either willful or gross negligence
in not having presented a written notice of their intention to exercise the option, then this finding of
fact would be legally sufficient. See Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex.
1993). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for
differing conclusions by reasonable minds about a vital fact's existence. Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983). However, failing that, we find the evidence to be legally insufficient
to support this finding, and we sustain this point of error.

 E. Finding that Denial of Specific Performance Would Result in Unconscionability
Because of Valuable Improvements Which the Pitcocks Had Made to the
Property and Had Anticipated the Construction of a House On It


 Although Merriam Webster's Collegiate Dictionary defines the term "unconscionable" to
mean "shockingly unfair or unjust," Merriam Webster's Collegiate Dictionary 1362 (11th ed.
2006), Texas courts have determined that the term carries no precise legal definition. In re Marriage
of Smith, 115 S.W.3d 126, 135 (Tex. App.--Texarkana 2003, pet. denied); Arthur's Garage, Inc. v.
Racal-Chubb Sec. Sys., 997 S.W.2d 803, 815 (Tex. App.--Dallas 1999, no pet.). Unconscionability
must be determined on a case-by-case basis in light of a variety of factors. See Sw. Bell Tel. Co. v.
DeLanney, 809 S.W.2d 493, 498 (Tex. 1991) (Gonzalez, J., concurring); Lee v. Daniels & Daniels,
264 S.W.3d 273 (Tex. App.--San Antonio 2008, pet. filed).

 Whether unconscionability exists is a matter of law, not a matter of fact. Hoover Slovacek
LLP v. Walton, 206 S.W.3d 557, 562 (Tex. 2006). However, that determination 

 is dependent upon the existence of facts which allegedly illustrate unconscionability.
And, as to the existence of those facts, our review is not de novo. In other words, we
cannot review the record, divine our own inferences from the evidence contained
therein, resolve conflicts in same, or decide what evidence to believe and what not
to believe. The power to do those things, that is, to find facts, lies with the trial court.
Once it has exercised that power, we must then defer to the findings made. And, as
long as the findings enjoy sufficient evidentiary support, they cannot be disturbed,
even though we may have construed the evidence differently. Nevertheless, this does
not prevent us from assessing whether the findings made illustrate unconscionability
for, again, that is a question of law. Nor does it prevent us from deciding whether the
evidence of record, when viewed in a light most favorable to the court's findings and
regardless of its potential inferences, illustrates unconscionability, for that too is a
question of law.


El Paso Natural Gas Co. v. Minco Oil & Gas Co., 964 S.W.2d 54, 60-61 (Tex. App.--Amarillo
1997), rev'd on other grounds, 8 S.W.3d 309 (Tex. 1999), as quoted in Ski River Dev., Inc. v.
McCalla, 167 S.W.3d 121, 136-37 (Tex. App.--Waco 2005, pet. denied). 

 In this case, the future intention or anticipation of the Pitcocks to construct a house on the
property the subject of the agreement is not a factor to consider in determining whether
unconscionable consequences will result if they are unable to complete the purchase which they seek. 
Accordingly, this desire is discounted in making this determination.

 Further, although the complained-of finding of fact indicates that the Pitcocks made "valuable 
improvements" to the real estate, the trial court did not indicate in its findings which of those
improvements had been considered by the court. Virtually all of the things which the Pitcocks
claimed they made as valuable improvements were contested by the Bestemans. More importantly,
in the record, none of the alleged improvements were itemized as to cost in any manner that would
allow segregation of true permanent improvements from contractually required maintenance items,
funds spent on other property, items for which nothing was actually spent, or items which were not
improvements at all. Accordingly, we are left with a rather amorphous finding of fact regarding
improvements which leaves us little guidance to aid us in determining whether the facts as found
would support unconscionability as a matter of law. 

 As mentioned above, the Pitcocks claimed to have improved ponds, cleared underbrush,
installed a concrete pad for washing horses, and fertilized the property. But even the concrete pad
(which seems to be the only clearly identifiable real and permanent improvement to the property)
and the pond improvements (which are less clearly real and permanent improvements) are not
associated with any clearly segregated costs shown in the evidence. It is impossible to determine
from the findings/conclusions which of the alleged expenditures were found by the trial court to have
been the basis for the trial court's finding of unconscionability. 

 The word "unconscionable" can be employed in at least two distinct circumstances in Texas
contracts which are not governed by specific statutes dealing with unconscionability:
unconscionability of contracts and unconscionability of results. Without delving deeply into the
nuances of what defines an unconscionable contract, it is basically one which is "grossly one-sided."
In re Poly-America, L.P., 262 S.W.3d 337, 348 (Tex. 2008). The Pitcocks make no claim that the
contract or any provision of it (including the requirement that timely written notice of the intent to
exercise the option be given) is unconscionable, only that strict enforcement of the notice provision
of the option would render the results unconscionable. Therefore, this is a case involving a claim
of unconscionable results. Although cases involving unconscionable contracts are not strictly on
point in this case, a review of unconscionability in that context is illustrative of the kinds of things
which courts find to be unconscionable. 

 Unconscionability tends to exist when certain, rather extreme, factors are involved in a
contract. For example, unconscionability aims "to prevent oppression and unfair surprise." 
Poly-America, L.P., 262 S.W.3d at 348. Often, a disparity in bargaining power can result in
oppression or unreasonableness that is labeled "unconscionable." See Saenz v. Martinez, No. 04-07-00339-CV, 2008 Tex. App. LEXIS 8297, at *25-28 (Tex. App.--San Antonio Nov. 5, 2008, no
pet. h.). Unconscionability has been found when there is a "gross disparity in the values exchanged"
and the "grounds for substantive abuse [are] sufficiently shocking or gross to compel the court to
intercede." McCalla, 167 S.W.3d at 136.

 The test for substantive unconscionability is whether, "given the parties' general
commercial background and the commercial needs of the particular trade or case, the
clause involved is so one-sided that it is unconscionable under the circumstances
existing when the parties made the contract."


In re Palm Harbor Homes, Inc., 195 S.W.3d 672, 678 (Tex. 2006) (quoting In re FirstMerit Bank,
52 S.W.3d 749, 757 (Tex. 2001)); Lawson v. Archer, Nos. 14-07-00324-CV & 14-07-00429-CV,
2008 Tex. App. LEXIS 5976, at *11-12 (Tex. App.--Houston [14th Dist.] July 31, 2008, [1 case-no
pet.], [1 case-no pet. h.]).

 [A] contract or contract provision is not invariably substantively unconscionable
simply because it is foolish for one party and very advantageous to the other. Instead,
a term is substantively unreasonable where the inequity of the term is so extreme as
to shock the conscience.

Anaheim Indus. v. GMC, No. 01-06-00440-CV, 2007 Tex. App. LEXIS 9950, at *28-29 (Tex.
App.--Houston [1st Dist.] Dec. 20, 2007, pet. denied). The high threshold a party must meet in
proving unconscionability is based on a strong policy favoring the freedom of contract. Churchill
Forge, Inc. v. Brown, 61 S.W.3d 368, 371 (Tex. 2001) (Texas has "strong commitment to the
principle of contractual freedom"). 

 Reviewing the evidence as presented, we find as a matter of law that the loss of the claimed
permanent improvements by the Pitcocks--especially given a potential tax cost to the Bestemans
caused by the substantial delay in notice--would not result in an unconscionable circumstance; to
the contrary, we find that the trial court erred in its ruling that it would be unconscionable to enforce
the contract's requirement that written notice of the exercise of the option be given on a timely basis. 

 We sustain this point of error. 

II. POINTS OF ERROR RELATING TO GRANT OF SPECIFIC PERFORMANCE OF
CONTRACT


 The Bestemans complain that the trial court erred in granting specific performance based
upon principals of equity. 

 The Jones case is the touchstone case for the equitable principal known as "disproportionate
forfeiture." Jones, 130 S.W.2d at 271. The opinion included a verbatim quote of a Connecticut
case (2) in saying,

 In cases of mere neglect in fulfilling a condition precedent of a lease, which do not
fall within accident or mistake, equity will relieve when the delay has been slight, the
loss to the lessor small, and when not to grant relief would result in such hardship to
the tenant as to make it unconscionable to enforce literally the condition precedent
of the lease. 


Id. The Pitcocks rely heavily on Jones and, rather surprisingly, upon Cattle Feeders, Inc. v. Jordan,
549 S.W.2d 29, 33 (Tex. Civ. App.--Corpus Christi 1977, no writ), for the proposition that equity
relieves them from the requirement to strictly comply with the notice requirements for the exercise
of an option. 

 In Jones, Gibbs had purchased timber under a timber deed with the right to remove the timber
for ten years. Jones, 130 S.W.2d at 266. The timber deed gave Gibbs a right, "in the nature of an
option," to extend the time to remove the timber for five years by the payment of an annual fee of
$205.68. Id. at 268. At the end of the ten-year period, two-thirds of the timber remained uncut. Id.
at 267. Under written direction from the administrator of the grantor's estate, Gibbs paid the first
annual extension fee to a creditor of the estate. Id. at 270-71. Gibbs paid the next year's fee to the
creditor as well, without written direction, but after the administrator had talked to the creditor about
receiving the extension fee as a credit. Id. at 271. Later, the administrator objected to Gibbs's
method of payment of the fee and filed suit to declare the timber deed expired.

 The Texas Commission of Appeals concluded the right was extended when Gibbs timely
paid, at the administrator's direction, the annual rental fee to the creditor: "[T]he testimony,
including that of [the administrator], which we have carefully examined, in our opinion clearly
shows that [the administrator] gave his consent that this rental be paid to [the creditor] and intended,
at least until after its payment, that it should be so paid." Id. at 270-71. The commission then
assumed that if the evidence did not establish the authorization to make the payment to the creditor,
the case was one for application of equity to excuse failure to strictly comply with the terms of an
option. (3) So, even if the administrator did not expressly authorize payment of the second annual
extension fee in such a way, Gibbs was nevertheless acting under the honest and justifiable, albeit
mistaken, belief that such payment was authorized as it had been the year before. See id. 

 As noted above, the Jones case listed one of the circumstances giving rise to the invocation
of the equitable doctrine as being "when the delay has been slight." Jones, 130 S.W.2d at 272. That
is not the circumstance here. The Pitcocks did not give written notice of their intention to exercise
the option until forty-nine days into the ninety-day notice period. Further, there was some culpability
on the part of the landowner in the Jones case in directing that payment to extend the option be made
elsewhere; there is nothing comparable here.

 In the Cattle Feeders, Inc. case, Cattle Feeders, Inc., as lessee, and the Jordans, the
lessors/landowners, entered into a five-year lease with an option to purchase the land. 549 S.W.2d
at 31. The agreement required that the cattle company give a ninety-day written notice of its intent
to exercise the option to purchase. (4) At the expiration of the lease period, Cattle Feeders sent a letter
to the Jordans in which it tendered the first purchase payment for the land pursuant to the terms set
out in the option agreement, a payment which the Jordans refused. Id. Cattle Feeders then brought
an action against the Jordans, seeking specific performance of the option agreement. The Jordans
filed a motion in limine to exclude from the jury all of the evidence that pertained to waiver or
estoppel on the part of the Jordans, and the trial court granted the motion.

 Cattle Feeders contended that the Jordans engaged in conduct that excused strict compliance
with the terms of the option agreement and that the trial court erred in refusing to allow Cattle
Feeders to present this evidence to the jury. This evidence, argued Cattle Feeders, would entitle it
to equitable relief under Jones. The excluded evidence included testimony from an individual who
sought to testify that he had cleared some of the land for Cattle Feeders, charging between $3,670.00
and $3,850.00 for those services. Id. at 31-32. Cattle Feeders's president also testified that the
original lease agreement was entered into to gain a tax advantage for the Jordans. Id. at 32. The
same witness further testified that Cattle Feeders cleared the land, graded the land for the appropriate
slope for a feed yard, built ponds on the land, constructed a mobile home park for its employees, and
made substantial expenditures on fences, fertilizer, and seed. Id. He, similarly to the testimony of
Pitcock in this case, testified that the company would not have made such expenditures if it was not
"under the impression" that Cattle Feeders would acquire the land. Id. Mrs. Jordan also testified,
explaining that she had observed all the improvements made and that she always thought Cattle
Feeders would purchase the land, but never knew with certainty. Id. She testified that she had
received no communication from Cattle Feeders indicating its intent to exercise its option to
purchase the land. Id.

 After briefly summarizing the principles outlined by Jones, the Corpus Christi court affirmed
the trial court's order, concluding that there was no evidence in the record that Cattle Feeders's failure
to provide timely notice of its intent to exercise the option was the result of an honest and justifiable
mistake. Id. at 32-33. The Cattle Feeders case does add by dictum another thing to consider, that
being 

 An optionee will be excused from strict compliance where his conduct in failing to
comply was not due to willful or gross negligence on the part of the optionee but was
rather the result of an honest and justifiable mistake. In addition, equity will also
excuse strict compliance where the strict compliance was prevented by some act of
the optionor such as waiver or misleading representations or conduct.


Id. at 33.

 In this case (as in Cattle Feeders), although Pitcock testified about the oral communications
he had made and the work he had performed on the land, he never proffered an explanation for the
reason for the forty-nine-day delay in giving the required written notice. 

 In summary, the Pitcocks failed to proffer an explanation for their failure to make timely
compliance with the written notice requirement of their notice of intention to exercise their option,
and the delay in delivering the required notice was not slight. We have determined as a matter of
law that loss of their ability to purchase will not operate to damage the Pitcocks. Accordingly, the
equity of disproportionate forfeiture does not apply in this case.

III. ERROR IN THE AWARD OF ATTORNEYS' FEES

 Attorneys' fees are recoverable from an opposing party only as authorized by statute or by
contract between the parties. Travelers Indem. Co. of Conn. v. Mayfield, 923 S.W.2d 590, 593 (Tex.
1996).

 The suit instituted by the Pitcocks was brought both to enforce a contract and pursuant to the
Declaratory Judgments Act. See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (Vernon
2008). Under the pleadings, attorneys' fees could be awarded pursuant to either Section 38.001(8) (5)
or Section 37.009 (6)
 of the Texas Civil Practice and Remedies Code. 

 An award of "equitable and just" attorneys' fees under an action for declaratory judgment is
within the discretion of a trial court. Tex. Civ. Prac. & Rem. Code Ann. § 37.009; Commissioners
Court v. Agan, 940 S.W.2d 77, 81 (Tex. 1997). 

 However, under Section 38.002 of the Texas Civil Practice and Remedies Code, the award
of reasonable attorneys' fees to the prevailing party in a breach of contract case is mandatory if there
is proof of the reasonableness of the fees. See Tex. Civ. Prac. & Rem. Code Ann. § 38.001
(Vernon 1997); Hassell Constr. Co. v. Stature Commercial Co., 162 S.W.3d 664, 668 (Tex.
App.--Houston [14th Dist.] 2005, no pet.). The amount of the award lies within the discretion of
the trial court but it does not have the discretion to deny attorneys' fees if they are proper. Hassell
Constr. Co., 162 S.W.3d at 668.

 Considering that the outcome of this case is changed, it will fall to the trial court to make a
determination of the award of attorneys' fees awarded between and among the parties.

 Accordingly, we reverse the judgment of the trial court in ordering the Pitcocks the requested
specific performance and attorneys' fees, render a declaratory judgment that the option to purchase
expired, and remand this matter to the trial court to make a determination of the merit of the
Bestemans' claim for recovery of unpaid rentals during the holdover period from the date of the
expiration of the two-year lease, and for reconsideration of the award of attorneys' fees.




 Bailey C. Moseley

 Justice


Date Submitted: October 29, 2008

Date Decided: December 5, 2008
1. No objection was lodged by the Bestemans that this equitable theory was not pleaded, either
at the trial level or on appeal. 
2. F. B. Fountain Co. v. Stein, 118 A. 47, 50 (Conn. 1922).
3. Because Jones presented the equitable analysis as an alternative basis, the Dallas court
characterized the discussion as dictum. See Reynolds-Penland Co. v. Hexter & Lobello, 567 S.W.2d
237, 240 (Tex. Civ. App.--Dallas 1978, writ dism'd by agr.) (refusing to apply the rule, dismissing
Jones language as mere dictum, and concluding the result in Jones rested on finding the option was
properly exercised). The Dallas court fairly recently reiterated its position on Jones. See Probus
Props. v. Kirby, 200 S.W.3d 258, 264 (Tex. App.--Dallas 2006, pet. denied) (concluding "that the
discussion of the doctrine of disproportionate forfeiture was not necessary to the decision in Jones
because the commission concluded the evidence established the administrator had directed the
payment be made to the creditor of the estate"). 
4. Although there was some suggestion that the cattle company had mailed a letter in April or
May 1971 notifying Jordan of its intent to purchase the land, that issue was not presented to the
Corpus Christi court and it expressly did not touch on that issue. Cattle Feeders, 549 S.W.2d at 31. 
5. "A person may recover reasonable attorney's fees from an individual or corporation, in
addition to the amount of a valid claim and costs, if the claim is for: (1) rendered services;
(2) performed labor; (3) furnished material; (4) freight or express overcharges; (5) lost or damaged
freight or express; (6) killed or injured stock; (7) a sworn account; or (8) an oral or written contract." 
Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 2008).
6. In any proceeding under this chapter, the trial court may award costs and reasonable and
necessary attorneys' fees as are equitable and just.




88 contracts for sale were not for purposes of lot
ownership, but were instead a scheme for winning the election of the Board of
Directors; the 1995 deed restrictions[7] were
in full force and effect; and the Association was the owner of all green areas,
picnic areas, swimming piers, boat ramps, mailboxes, and clubhouses and did not
owe any fees to the Development from their use.  The court further enjoined the Nelson Group
from holding themselves out as Association directors and/or exercising any
control over the Associations property or assets, including bank
accounts.  It awarded the Association
$23,400.00, and an additional $5,000.00 conditioned upon successful
appeal.  

            Only
Nelson and the Development appeal the trial courts ruling. 

II.        Trial Court Properly Granted Declaratory
Judgment 

            A person interested under a deed, will,
written contract, or other writings constituting a contract . . . may have
determined any question of construction or validity arising under the
instrument, . . . and obtain a declaration of rights, status, or other legal
relations thereunder.  Tex. Civ. Prac. & Rem. Code Ann. §
37.004(a) (Vernon 2008).  We review
declaratory judgments in the same manner as other orders, judgments, and
decrees.  Tex. Civ. Prac. & Rem. Code Ann. § 37.010 (Vernon 2008); Mid-Century Ins. Co. of Tex. v. Childs,
15 S.W.3d 187, 188 (Tex. App.Texarkana 2000, no pet.).  In this case, findings of fact and
conclusions of law were not requested or made. 
Thus, we must uphold the trial courts judgment if it can be sustained
upon any legal theory supported by the evidence.  Childs,
15 S.W.3d at 188 (citing In re W.E.R.,
669 S.W.2d 716, 717 (Tex. 1984)); Rosen
v. Wells Fargo Bank Tex., N.A., 114 S.W.3d 145, 14849 (Tex. App.Austin
2003, no pet.). 

A.        The
Purported New Members Were Not Entitled to Vote Pursuant to Association Bylaws

 

            Nelson and the Development argue
that the trial court erred in finding that June 3, 2007 . . . membership
election invalid.  The trial court reasoned:  its standard practice in membership meetings
in homeowners associations or stockholders meetings, in corporations, for there
to be a cutoff date for people who are expecting to vote to have provided the
information necessary to the people who are verifying it.[8]  

            The
trial court found that Hall

had
the authority to recess the meeting.  She
was the presiding officer, and as such, she had the authority to recess it to
take some time to look at the -- as to whether or not this list of posed new
members was a good list and whether these people should be able to vote.  There were issues as to -- there were a whole
series of issues on that including whether or not the lots were platted or not
platted.[9]

 

            With
questions of new owner membership in the air, Hall could call for a vote to
adjourn the meeting.  The bylaws state
that Roberts Rules of Order govern the meeting and voting process where not
otherwise specified.  Article III of
these rules provide that a motion to adjourn takes precedence over all other
motions, is not debatable, and will carry by majority vote.  Hall testified that the meeting was adjourned
following a motion second and vote by all present, including the purported
new members.[10]  A witness for the Nelson Group
comprised a list of those who voted to adjourn and those who did not.  According to this witness, fourteen people
voted to adjourn and twenty people voted against, an assertion with which the
trial court as trier of fact could have disagreed.[11]  Further, although the Association bylaws allow [a]ny person who
is the owner of legal or equitable title in any lot or living unit or any
person who is a buyer under and pursuant to a contract for deed of any lot or
living unit which is subject to present or future assessment by the Association
. . . [to] be a Member of the Association, the person must submit an
Application for Association Membership to the Board of Directors prior to
obtaining ownership of any lot or living unit. 
In order to vote, the bylaws state that the member must first pay their
annual assessment fee.  It is undisputed
that none of the purported new members filed an application for membership or
paid the full amount of the annual dues. 
They were not entitled to vote on the issue of adjournment.  Thus, the trial courts decision that Hall
had the authority to adjourn the meeting is supported by the bylaws and other
evidence.  

            On
motion for rehearing, Nelson points to our opinion in Ostrowski v. Ivanhoe Property Owners Improvement Association, and
suggests that we erred in relying on Association bylaws to determine membership
status.  38 S.W.3d 248 (Tex. App.Texarkana
2001, pet. denied).  

            In
Ostrowski, bylaws stated owners who
were current with the payments of fees could vote, while a later drafted
Maintenance Fund Agreement (MFA) provided only owners of the majority of the
lots could vote to raise maintenance charges. 
Id. at 25152 n.5. 
Recognizing that the bylaws and MFA created a conflict, we held that
while the bylaws govern[ed] the general process by which initiatives are
decided by the Association, the MFA controlled the specific question of who
could vote to raise maintenance charges. 
Id. at 25354.  This was the conclusion we reached in harmonizing
the provisions of the MFA and the bylaws and read[ing] them together.  Id. at
254.  

            The
Nelson Group argues that the 1995 deed restrictions conflict with the bylaws
because the restrictions refer to automatic membership into the
Association.  However, both the bylaws
and 1995 deed restrictions require that new members submit an application for membership.[12]
Further, the deed restrictions do not address the issue of which members are
entitled to vote at Association meetings, while the bylaws state that [m]embers
are entitled to one vote for each annual assessment fee (dues) paid.  Since there is no conflict between the bylaws
and deed restrictions, Ostrowski does
not apply to this case.

            Because
Nelson had no authority to preside over the meeting electing new board members,
actions taken at the Nelson Group meeting, and the results following, were
invalid.  We find no error in the
courts ruling.  See Childs, 15 S.W.3d at 188. 
We overrule the first point of error. 

            B.        The
Green Areas Belonged to the Association Pursuant to Deed

            Next,
Nelson and the Development argue that since the green areas are unplatted, they
belong to the Development and the trial court erred in holding otherwise.[13]  A 1984 deed to the Association, as well as
annual meeting minutes dating back to 2002, demonstrate Association ownership
and control of green areas.[14]  The deed refers to the lake in its conveyance
and states [a]ll green areas and picnic areas shown on all the plats of Big
Woods Springs Addition referred to above are to be conveyed herewith.  All streets or roads . . . are to be conveyed
herewith.  The minutes reflect that
Association volunteers and contractors are to mow the green areas and proposed
to block access of strangers to the boat ramp via use of a combination lock.  The bylaws also state that only members may
use the lake, park areas, dumpster, clubhouse, apartment, fishing and swimming
docks, and other Association facilities, all included within the deed to the
Association.  

            Nelson
and the Development concede on appeal that the clubhouse and lake were deeded
to the Association, but claim that the green area between Lots 520 and 521
could not have been included in the deeds since they were outside the plats
identified in the deeds.  A plat
referencing green area adjacent to lot 520 was recorded in 1982.  Thus, the court could determine it fell within
the 1984 conveyance of [a]ll green areas . . . shown on all the
plats of Big Woods Springs Addition.  

            The
next point of contention involves the community mailboxes, which the Nelson
Group contends do not belong to the Association.  The trial court was free to find otherwise,
since the Association was given a permit in 2001 to install and use the
community mailboxes.  Also, the community
mailboxes appear to be located on green area according to a map provided to the
trial court.  

            Thus,
because the trial courts
ruling is supported by the deeds and other evidence, we must uphold its ruling
and overrule this point of error. 

III.       Alleged Error in Award
of Attorneys Fees to Association Not Preserved

            Under
Section 37.009, a trial court may award reasonable and necessary attorneys
fees that are equitable and just.  Tex. Civ. Prac. & Rem. Code Ann. §
37.009 (Vernon 2008).  The Associations
attorney testified he billed $200.00 per hour for work that he did and $85.00
per hour for work completed by his legal assistant.  Asserting that he spent 100 hours on this
case and the legal assistant spent forty hours, the attorney asked for a total
fee of $23,400.00. 

            No
objection or argument as to the amount of legal fees charged by the Associations
attorney was lodged until appeal.  First,
Nelson and the Development state there is no evidence whatsoever that the fees
awarded Plaintiff were reasonable or equitable and just in these circumstances.  In order to preserve a complaint for
appellate review, a party must present a timely request, objection, or motion
to the trial court.  See Tex.
R. App. P. 33.1(a)(1).  The Nelson
Groups counsel stated his labors have been not as exhaustive as the
Associations attorney, that he did not think that Ive had that much time in
the case.  Im not being paid by the
hour, and as a result, I have not kept hourly records.  He asked the court to award $12,500.00 to
$15,000.00 in attorneys fees as opposed to the higher number advocated by the
Associations counsel.  However, the
Nelson Groups attorney never questioned the reasonableness and necessity of
attorneys fees.  He merely suggested
during closing argument that each side has enough merit to its case that each
side ought to bear its own attorneys fees. 
We find this issue was not preserved. 
Save Our Springs Alliance, Inc. v.
Lazy Nine Mun. Util. Dist. ex rel. Bd. of Directors, 198 S.W.3d 300, 318
(Tex. App.Texarkana 2006, pet. denied).[15]  

            Next,
Nelson and the Development argue that the attorneys fees should have been
reduced by the amount of fees expended on issues abandoned or lost by the
Association, such that it could not be considered a prevailing party on certain
claims.[16]  No such objection was made to the trial
court.  Thus, we also conclude this
contention was not preserved.   Id.; see
also Red Rock Props. 2005, Ltd. v. Chase Home Fin., L.L.C., No.
14-08-00352-CV, 2009 WL 1795037, at *7 (Tex. App.Houston [14th Dist.] June
25, 2009, no pet.) (mem. op.) (objection that attorneys fees were not
segregated was not preserved in trial court); Fortenberry v. Cavanaugh, No. 03-07-00310-CV, 2008 WL 4997568,
at *11 (Tex. App.Austin Nov. 26, 2008, pet. denied) (mem. op.) (same).  

IV.       Conclusion


            We
overrule the motion for rehearing.  We affirm the trial courts judgment. 

                                                                        

 

                                                                        Jack Carter

                                                                        Justice

 

Date Submitted:          June 22, 2010

Date Decided:             August 12, 2010

 











[1]The
Development was co-owned and operated by a relative of Nelson.  

 





[2]The
Association returned the check because [t]he persons for whom the dues are
intended are not approved members.  





[3]The
Association also sought declaratory judgment against the Development for
certain timbering operations.  The
Association was granted a nonsuit of these claims.  

 





[4]The
trial court granted a temporary injunction to this effect, which is not
addressed in this opinion.  

 





[5]The
Nelson Group argues that the deed restrictions govern the voting process.  As discussed later, we find that the general
voting process is governed by the Association bylaws.

 





[6]There
is no contest that Nelson and Rebecca owned at least one lot subject to the
Associations deed restrictions since 1973. 
The trial court in this cause issued a temporary injunction finding that
the Nelsons were entitled to notice of membership meetings and could vote in
upcoming elections as long as they paid their yearly dues in accordance with
the deed restrictions, which were imposed after the 1974 letter stating the
Nelsons received a life long membership . . . without payment of any
dues.  





[7]The restrictions referenced in the
trial courts judgment contained the following language: 

 

Each purchaser of a tract or lot in
the Subdivision must be a member of the Association. Upon acceptance of an
application for membership in Big Woods Springs Association the simultaneous
execution of a sales contract or the acceptance of a deed, each owner shall
become a member . . . . Said membership shall be conditioned upon payment
when due of such dues, fees and maintenance charges as the Association shall
find necessary . . . . 





[8]Under the Texas Business
Organizations Code governing nonprofit corporations, the record date for determining
the owners or members of a corporation is the date on which:  (1) notice of the meeting is given to the
owners or members entitled to notice of the meeting as provided by Section
6.101(d).  Tex. Bus. Orgs. Code Ann. § 6.101(d) (Vernon 2009).  The bylaws require such notification to be
mailed ten days prior to the annual meeting, suggesting that the new owners
would be cut off from membership for purpose of the annual meeting vote.  

 





[9]The
parties make an argument as to the validity or invalidity of the sales
contracts.  The record
reflects that certain contracts for sale, all signed on June 1, 2007, provided
for deferred payment and contained provisions allowing the buyer to cancel
this contract without penalty within 14 days of the effective date . . . by
signing and returning the attached Notice to Cancel Contract.  In her deposition, Baker claimed that none of
the purported new owners had made any payments with respect to the contracts
for sale referenced in deposition exhibit numbers 6, 7, and 8 which were not
provided to this Court.  Hall reiterated
that these contracts for sale were cancelled. 
While the trial court found the contracts valid, it was also led to the
conclusion that the sales were for the purpose of influencing the
election.  In our opinion, because the trial courts ruling did not
depend on the nature of these new sales contracts, but rather on whether Hall
had the authority to adjourn the meeting and whether Nelson had the right to
preside over another meeting, we need not address this issue.

 





[10]Roberts
Rules of Order is a procedural manual guiding parliamentary process.  See Henry M. Robert et al., Roberts Rules of
Order, Newly Revised (10th ed. 2000).

 





[11]In
a bench trial, the court is the sole judge of the witness credibility and the
weight to be afforded the testimony. Moore
v. Jet Stream Invs., Ltd., No. 06-09-00106-CV, 2010 WL 2197703, at *5 (Tex.
App.Texarkana June 3, 2010, pet. filed) (citing Tate v. Commodore County Mut. Ins. Co., 767 S.W.2d 219, 224 (Tex.
App.Dallas 1989, writ denied)). The trial court, as the fact-finder, has the
right to accept or reject all or any part of any witness testimony.  Id.
at *5 (citing Griffin Indus., Inc. v.
Honorable Thirteenth Court of Appeals, 934 S.W.2d 349, 357 (Tex. 1996)).  On rehearing, the Nelson Group argues that
Nelson was a not a new member to the Association and that his votes were enough
to carry the motion to adjourn.  Per
Association bylaws, members are entitled to one vote for each annual dues
paid.  There is no evidence in the record
clarifying how many annual dues were paid in full by Nelson, which may have
entitled him to more than one vote. 





[12]The
deed restrictions specify each owner shall become a member [u]pon acceptance
of an application for membership . . . on the simultaneous execution of a sales
contract or the acceptance of a deed.  

 





[13]We
note that with an exception not applicable here, a trespass to try title claim
is the exclusive method in Texas for adjudicating disputed claims of title to
real property.  See Tex. Prop. Code Ann.
§ 22.001(a) (Vernon 2000); Martin v.
Amerman, 133 S.W.3d 262, 267 (Tex. 2004); Koch v. Tex. Gen. Land Office, 273 S.W.3d 451, 455 (Tex.
App.Austin 2008, pet. filed); Glover v.
Union Pac. R.R. Co., 187 S.W.3d 201, 211 (Tex. App.Texarkana 2006, pet.
denied). When the suit does not involve the construction or validity of deeds
or other documents of title, the suit is not one for declaratory judgment.  McRae
Exploration & Prod. Co. v. Reserve Petroleum Co., 962 S.W.2d 676, 685
(Tex. App.Waco 1998, pet. denied).  The
situation at hand involves both the title to lands and the construction to be
placed on the deed of conveyance of part of the lands in controversy.  Unlike our recent case of Ramsey v. Grizzle, No. 06-09-00026-CV, 2010 WL 1980247 (Tex.
App.Texarkana May 19, 2010, no pet.), this issue has not been raised on
appeal; accordingly, the treatment of this matter solely as an action in
declaratory judgment would be unassigned or unpreserved error at best,
something we cannot entertain.  Tex. R. App. P. 33.1.

 





[14]Hall testified it was the
Associations position that the swimming area, fishing pier, and picnic area
were transferred with the 1984 deed.  

 





[15]The
court has discretion to award attorneys fees in a declaratory judgment action
in an amount it determines is equitable and just.  Id. at
319.  Had this issue been preserved, the
trial court was free to determine that the Associations attorneys testimony
established that the fees sought were equitable and just. 

 





[16]In
any event, an award of attorneys fees under the Uniform Declaratory Judgments
Act is not dependent upon a finding that the party prevailed.  City of
The Colony v. N. Tex. Mun. Water Dist., 272 S.W.3d 699, 754 (Tex.
App.Fort Worth 2008, pet. dismd) (citing
Barshop v. Medina County Underground Water Conservation Dist., 925 S.W.2d
618, 637 (Tex. 1996)); Dorman v. Arnold,
932 S.W.2d 225, 229 (Tex. App.Texarkana 1996, no writ).