**Praxedis J. DOVALINA, Appellant,**

v.

**H. A. ALBERT et al., Appellees.**

**No. 7661.**

Court of Civil Appeals of Texas.

Amarillo.

Nov. 28, 1966.

Rehearing Denied Dec. 27, 1966.

Herbert C. Martin, Ochsner, Nobles & Baughman, Amarillo, for appellant.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., Howard M. Fender and Larry J. Craddock, Asst. Attys. Gen., Larry Craddock, Jr., Austin, of counsel, for appellees.

CHAPMAN, Justice.

The principal subject matter of this suit constitutes an attack upon the constitutionality of Article 2615f–2, Vernon's Ann. Texas Revised Civil Statutes (1965), titled Polygraph Examiners Act. Appellant is Praxedis J. Dovalina, who failed the examination required under the named article that is designed to insure that all operators of polygraph equipment in Texas meet minimum standards of competence. Appellees are the members of the Board of Polygraph Examiners, sued individually and as members of the Board. A writ of mandamus was sought requiring the Board to issue a polygraph examiners license to Dovalina, and alternatively that it be permanently enjoined from seeking to enforce the act against him. The case was tried to the court and judgment rendered denying appellant all relief sought.

The first point of error asserts the subject article is void because in violation of the Texas Constitution, Article 1, Section 16, Vernon's Ann.St. in that it impaired the obligation of valid and subsisting contracts held by appellant prior to the passage of the act and in effect at the time of trial.

The testimony shows that prior to the effective date of the Polygraph Examiners Act appellant was polygraphing pre-

employees for Blue Morrow Sales, Inc. and making polygraph examinations on a certain number of employees on a monthly basis selected at random from three companies owned by Mr. Marmaduke. The latter service was upon a written contract.

The strict question presented in this point is whether one performing in the profession of a polygraph operator with a polygraphing business such as Dovalina's at the time legislation is enacted may be regulated by legislation requiring minimum standards of competence.

It requires no citation of authorities to say that the legislature can regulate the sales of services of people operating in professional areas such as lawyers, doctors, pharmacists, etc., to the extent of insuring that such people possess the minimum standards of skills required of members of their respective professions. From the testimony in this record, and from common sense, it appears that a polygraph operator passing upon the truth or falsity of those he examines should be required to possess minimum skills in order to detect the presence or absence of deception and those conditions which distort the recording. With respect to the skills that must be possessed by a polygraph examiner it has been textually stated,[1] inter alia, that:

"In discerning whether a particular subject has attempted deception, the examiner must select some point on the polygraph recording as dividing truth from falsehood. Statistics of accuracy are thus directly related to the selected cut-off point and may be adjusted accordingly. *This determination depends entirely upon the skill and experience of the operator.* His decision concerning the presence or absence of deception must also take into account the subject's physical and mental condition at the time of the test. Any impairment, such as excessive anxiety, fatigue, prolonged interrogation, or drug or alcohol influence,

---

1. Lie Detectors in Private Employment: A Proposal for Balancing Interests, 33

George Washington Law Review, p. 932 at pp. 934, 935.

will distort the recording. Psychiatrists further assert that the polygraph may record subjective and unconscious thoughts involuntarily communicated, and they complain that mere technicians thus may be evaluating emotions and unconscious thoughts." (Emphasis added.)

In a case involving the questions of the right of the State of Texas to prohibit the use of sweet natural gas for the manufacture of carbon black in the Panhandle field of Texas,[2] despite private contract provisions to deliver same, the United States Supreme Court said:

"The contention is that the contract clause of the Texas Constitution, (Article 1, § 16) unlike that of the Federal Constitution, prevents the State from enacting a police measure which will result in impairing a contract. In support of that proposition, the company cites Travelers' Ins. Co. v. Marshall, 124 Tex. 45, 76 S.W.2d 1007, 96 A.L.R. 802, decided by the Supreme Court of Texas in 1934. But that case does not support the proposition. The statute there held void was a moratorium statute specifically directed against the terms of contracts. The statute here challenged is not directed against any term of any contract. It deals merely with the use of an article of commerce; and its effect upon contracts is incidental."

The Travelers' Ins. Co. case cited in the quote just made is one of those cases relied upon by appellant and is distinguished from our case just as it was distinguished in Henderson Co. v. Thompson, supra. The statute there held void involved moratorium legislation directed against the terms of contracts. Here as in Henderson the stat-ute challenged is not directed against any term of any contract and its effect upon contracts is only incidental. See also State v. Missouri, K. & T. Ry. Co. of Texas, 99 Tex. 516, 91 S.W. 214, 5 L.R.A.,N.S., 783 (1906) wherein the Court of Last Resort of Texas held parties to the contract that violated an anti-trust statute could not continue activities that had become illegal by legislative action even though when contractually provided for it was legal.

■ But appellant contends the regulation of contracts may not be given retroactive effect. The cases he relies upon involved such situations as contracts on which there had been partial performance prior to the challenged legislation, such as recovery for real estate fees for services commenced before a license was required to sell real estate or cases of like import. There is not anything in this record to indicate a contention that appellant would have been prohibited from recovering for polygraph examinations performed prior to the effective date of Article 2615f–2.

■ Appellees have well stated by brief that if appellant's " * * * means of livelihood is a right of protection against infringement by the Constitution then the means of livelihood of those who are subjected to polygraph examination by him is also protected, and if such people are to be screened from employment on his recommendation, surely the legislature is not prohibited from enacting legislation to insure that such people will not be unfairly judged." The point is overruled.

Appellant's Point 2 attacks the constitutionality of Section 8, the "grandfather" clause of the subject article.[3]

2. Henderson Co. v. Thompson, 300 U.S. 258, 57 S.Ct. 447, 81 L.Ed. 632, 638.

3. That section provides in effect that one actually engaged in the profession of a polygraph examiner and using an instrument which records visually, permanently and simultaneously a subject's cardiovascular pattern, respiratory pattern and other physiological changes, shall, upon application, within ninety days after the effective date of the act be issued a license effective for a year, provided he satisfies the requirements of Section 7 (1) and (4) (21 years of age and having not been convicted of a felony or misdemeanor going to moral turpitude) and Section 7(7, 8) with respect to passing examinations conducted by the Board to determine competency and the making

We do not consider the cases he cites furnish proper authority for his contention. The case of Falfurrias Creamery Company v. City of Laredo, 276 S.W.2d 351 (Tex. Civ.App.-San Antonio 1955, writ ref'd n. r. e.), is the only Texas case cited. The case concerned an attempt by the City of Laredo to require independent milk inspection by the health inspector of that city of milk delivered therein which had passed inspection by Falfurrias Creamery Company even though an inspection service was maintained by the latter city which was fully approved and accredited by the state authorities. Though the court held a second inspection was an unwarranted restriction of appellant's rights under the contract clause because public protection was adequately insured by the Falfurrias inspection, there is no indication in the opinion that the court would hold unconstitutional the state-wide inspection act, even though examinations thereunder might infringe upon private contract. The device of the second inspection was simply to protect local dairymen against outside competition.

■ Neither do we consider the citations from other jurisdictions as supporting appellant's contention. For example the Florida Supreme Court case[4] cited by appellant held unconstitutional a Naturopathy Act of the State, not under the usual "grandfather" clause, but which granted special privileges to a limited group, such group being a closed class within a larger closed class. The two other cited cases[5] involved a dispensing optician and a barber. The former was held not to come within the "grandfather" clause for the reason that during the year preceding enactment of the statute governing licensing of dispensing opticians Schwab did not work directly with patients, fitting, or dispensing optical devices, a year of practice in that area be-

fore the effective date of the act being the period required under the Arizona act for dispensing opticians. In the case of the barber the court held a part-time teacher of the barber trade, compelled by circumstances beyond his control to give up full time teaching, came within the "grandfather" clause. The "grandfather" clause of the statute of that state provided, inter alia, that if one was operating and instructing in a school of barbering duly licensed under the laws of the state, he might be issued a license without taking examination upon payment of the prescribed fee. The statute we have under construction has no such provision, and additionally we believe the trade or craft of a barber as it affects other people would have little analogy to that of the profession of a polygraph operator as that profession affects the public interest. The point is overruled.

Appellant's third point contends that Section 18 of the subject act sets forth the grounds upon which the Board may refuse to issue a polygraph license and since failure to pass the examination is not one of the grounds the Board was without authority to refuse a license.

■ Subsection (7) of Section 18 provides in effect that a license may be refused if the applicant demonstrates unworthiness or incompetence to act as a polygraph examiner as defined by the act. From the record before us the results of the examination taken by applicant clearly demonstrated his incompetence. Additionally: "Each part of the statute is to be considered in connection with the entire enactment, in order to produce a harmonious whole and to reach the true legislative intent." 53 Tex.Jur.2d, Section 160, Statutes, pp. 231–232. "No inflexible rule can be announced for the construction of stat-

---

of a surety bond or insurance policy conditioned that the obligor will pay to the extent of the face amount of the bond or policy all judgments recovered against the licensee by reason of any wrongful or illegal acts committed by him in the course of his examination.

4. Eslin v. Collins, 108 So.2d 889 (1959).

5. State Board of Dispensing Opticians v. Schwab, 93 Ariz. 328, 380 P.2d 784 (1963); State ex rel. Krausmann v. Streeter, 226 Minn. 458, 33 N.W.2d 56, 4 A.L.R.2d 662 (1948).

utes. However, the dominant rule to be observed is to give effect to the intention of the Legislature." Magnolia Petroleum Co. v. Walker, 125 Tex. 430, 83 S.W.2d 929, 934 (1935). A study of the subject act clearly impels the motive of the legislature as being to require a minimum standard of efficiency in polygraph examiners. Therefore, Subsection (7) under Section 7 providing a person is qualified to receive a license who has passed an examination conducted by the Board, or under its supervision to determine his competency must be considered. That part of the statute eliminated appellant under the record before us.

■ The last point contends there was reversible error in refusing appellant a license because the Board itself was not legally constituted to serve as a Board, to prepare and submit an examination or to grade the examination papers for the reason that they had not passed an examination conducted by the Board, or under its supervision, to determine his competency to obtain a license to practice as an examiner. The statute was passed in 1965, Acts 59th Leg., p. 888, ch. 441 and provided the Board should be appointed by the governor with the advice and consent of the Senate. Section 4(a). The argument under the point contends the Board was not legally constituted to prepare and submit an examination or pass on the answers thereto because under Subdivision (7) of Section 7 a person qualified to receive a license must have passed an examination conducted by the Board. If this is required of the initial Board it is obvious that the governor's appointments and the Senate's confirmation thereof are null and void, as all appointees must have passed an examination conducted by the Board with no Board in existence. Thus, the entire act would be a nullity. There simply would be no way to bring the Board into existence. It would be like trying to bring a chicken or egg into being without the existence of either.

■ Though analogous to our own case only because it involves statutory construction, the Supreme Court of Texas has held in a case involving the construction of the act providing for workman's compensation for employees of the state highway department [6] that:

"A statute will not be construed so as to ascribe to the Legislature an intention of doing an unjust thing by its enactment, or of causing confusion thereby, if the statute is reasonably susceptible of a construction showing the Legislature's intention to have been otherwise."

In 53 Tex.Jur.2d, Section 165, p. 243, it is textually stated:

"The court will never adopt a construction that will make a statute absurd or ridiculous, or one that will lead to absurd conclusions or consequences, if the language of the enactment is susceptible of any other meaning. Nor will application be made of any rule of construction that, in the circumstances, will lead to absurdity. Thus, a statute or provision should not be given a construction rendering it fruitless, futile, meaningless, purposeless, or useless, if the language can be otherwise construed. The reason of the rule is that the legislature is not to be credited with doing or intending a foolish, useless, or vain thing, nor with requiring a futile, impossible, or useless thing to be done."

The record shows by at least two members of the Board that different members made up separate areas constituting the examination in question and that each member knew the questions and answers. Though not taking the examination along with appellant and others not on the Board, Captain Wynne testified: "We had already taken it [the examination], as I testified before, several times." Mr. Albert, Chairman of the Board, was trained by the Department of Public Safety examiner and is now supervisor charged with the responsibility of

---

6.   State Highway Dept. v. Gorham, 139 Tex. 361, 162 S.W.2d 934, syl. 5, 936 (1942).

training Department of Public Safety examiners only. He testified his personal opinion was that the examination given to appellant, which he failed, was not rigid enough.

■ Considering Article 2615f–2 as a whole, we do not believe the denial of a license to appellant by the Board violated the statutory requirements nor denied him due process of law.

There is at least an inference in the record that Captain Wynne graded appellant's paper and failed him because he is a competitor in Amarillo. Captain Wynne testified he graded the papers without giving any attention to whose they were but did notice when he was partly finished with appellant's paper that it was Mr. Dovalina's, so he handed it to another member of the Board to grade.

■ Since the case was tried to the court the ordinary presumptions would have to be indulged in favor of the judgment.

Accordingly, the judgment of the trial court is in all things affirmed.