**Joy OSTROWSKI, et al., Appellants,**

v.

**IVANHOE PROPERTY OWNERS IMPROVEMENT ASSOCIATION, INC., Appellee.**

No. 06–00–00004–CV.

Court of Appeals of Texas, Texarkana.

Submitted Dec. 14, 2000.

Decided Jan. 25, 2001.

Rehearing Overruled Feb. 21, 2001.

C. Scott Mann, Jr., Germer, Bernsen & Gertz, LLP, Beaumont, for appellant.

Walter D. Snider, Snider & Morgan, LLP, Beaumont, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

In this case we address two appeals arising from a declaratory judgment action by a group of lot owners against the Ivanhoe Property Owners Improvement Association, Inc. (the Association). In the first appeal, the lot owners appeal from the trial court's summary judgment declaring,

among other things, that in the future the fees lot owners are required to pay may be increased by vote of a majority of those voting, which the owners allege violates the provisions in various dedicatory instruments. In the second appeal, the Association appeals the trial court's judgment invalidating previously assessed fees. The Association alternatively contends that the owners have waived their right to recover the previously paid fees, or have ratified their assessment, so the trial court erred in denying the Association's claim against the owners for collection of past due assessments and attorney's fees for enforcing such assessments. We reverse and render judgment on the owners' motion for partial summary judgment, and remand for a determination of their reasonable attorney's fees. The Association's claim for collection of past due fees and the owners' claims for reimbursement of past paid fees are severed and remanded to the trial court for trial.

Various land owners in fourteen of twenty-three Ivanhoe Land of Lakes subdivisions (Ivanhoe) sued, seeking a declaration by the trial court that the Association's method of raising property assessments violated the restrictive covenants of various subdivisions in the community and the Maintenance Fund Agreement (MFA) executed by the developer of Lake Ivanhoe and the Association in 1964. The Association eventually became an incorporated nonprofit association.[1] The MFA granted the Association certain enumerated powers, including the collecting and expending of maintenance fees, to be applied for the benefit of the entire subdivision. Section 4 of the MFA provides that the original maintenance charge would extend for fifteen years after the creation of the community and for successive periods of ten years thereafter "unless *the owners of the majority of the lots* paying such charge vote to discontinue such charge." Further, Section 5 provides, "Such annual charges or dues may be adjudged [sic] from year to year by said association as the need to the property may, in its judgment, require but in no event shall such charge be raised unless approved *by a majority vote of the lot owners.*"

For the first fifteen subdivisions, the MFA provided for a $6.00 maintenance charge with no provision for an increase. The next three were subject to a $6.00 charge plus an additional $36.00 charge per lot for repair, maintenance, and upkeep of common areas within those specific subdivisions.[2] For the last five subdivisions, there was a $120.00 charge per year, which the Association may not raise more than ten percent without a vote of the membership.

The owners contend that Section 5 of the MFA prohibits an increase in the fees unless such an increase is approved by a majority of the lot owners, and that the Association was not authorized to raise maintenance fees simply by obtaining a majority vote of the members present at a duly called meeting at which a quorum was present.[3] Despite the above language in the MFA, the Association conducted seven votes of lot owners attending the meetings,

1. The Association did not incorporate until 1972. The former association assigned all of its rights, including the right to collect and expend maintenance funds, in an instrument which was subsequently recorded in the real property records of Tyler County.

2. Restrictive covenants in these eighteen subdivisions provide that the $6.00 maintenance charge be used pursuant to the provisions in the MFA.

3. The Association's brief indicates that this is in accordance with both its bylaws and articles of incorporation. The quorum language is consistent with the requirements established by the Texas Business Corporation Act, which provides that a corporation may not act without a quorum present. 20 ROBERT W. HAMILTON, TEXAS PRACTICE: BUSINESS ORGANIZATIONS § 564 (1973 & Supp.2000). More specifically, the Texas Non Profit Corporation Act states, "The vote of a majority of the votes entitled to be cast by the members present, or represented by proxy at the meeting at which a quorum is present, shall be the act of the members meeting...." TEX.REV.CIV. STAT. ANN. art. 1396–2.12 (Vernon 1997).

each time increasing the amount of maintenance fees to be collected.[4] The Association argued that even if the MFA required a majority vote of all lot owners, the owners were not entitled to relief because the elections it conducted were consistent with the Association's bylaws and, furthermore, the owners had ratified the elections, or had waived their right to complain.

The trial court construed the language of Section 5 of the MFA to mean that maintenance fees could be increased on a vote of the majority of lot owners voting at the meeting where a quorum was present. The court further held that these votes were to be held on a subdivision-by-subdivision basis, with voting open to all owners of lots in the particular subdivision conducting the election.[5] Finally, the court held that the increases passed in 1983, 1990, and 1991 were not enforceable, but the owners were not entitled to a reimbursement of the existing increases paid prior to or after the date of the judgment.[6] Accordingly, each party was required to pay its own court costs and attorney's fees.

▪ A summary judgment is proper only when the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Tex.R.Civ.P. 166a. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true, and every reasonable inference and doubt must be indulged and resolved in the nonmovant's favor. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). When both parties move for summary judgment, the nonprevailing party may appeal both the granting of the prevailing party's motion and the denial of its own motion. *See*

*Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex.1996); *Tobin v. Garcia*, 159 Tex. 58, 316 S.W.2d 396, 400 (1958). We liberally construe appeals involving cross-motions for summary judgment, and if the point of error sufficiently shows that the appellant is contesting both the granting of the appellee's motion and the denial of its own motion, we will consider both issues. *See Runyan v. Mullins*, 864 S.W.2d 785, 787–88 (Tex.App.—Fort Worth 1993, writ denied). In addition, when reviewing cross-motions for summary judgment, we consider all the summary judgment proof and determine all questions presented. *Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex.1997). We may affirm the trial court's summary judgment or reverse and render judgment on the nonprevailing party's motion. *See Holmes v. Morales*, 924 S.W.2d at 922; *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988).

▪ The essential question in this case is the proper legal construction of the provisions in the MFA relating to the manner in which a vote to amend maintenance charges must be conducted. Restrictions in dedicatory instruments such as the MFA are treated as contracts between parties. *See Herbert v. Polly Ranch Homeowners Ass'n*, 943 S.W.2d 906, 907–08 (Tex.App.—Houston [1st Dist.] 1996, no writ). Accordingly, instruments such as the MFA and restrictive covenants are subject to the general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex.1998). The question of whether a restrictive covenant is ambiguous is a question of law for the court. *Id.; Fisk Elec. v. Constructors & Assocs.*, 888 S.W.2d 813, 814 (Tex.1994). An ambiguity does not arise simply because the parties advance conflicting interpretations

4. The first vote took place in 1983. They again voted in 1986 to repair a dam damaged by Hurricane Bonnie, in 1989 for road repairs, in 1990, 1991, and twice in 1996 to retire a $1.5 million loan to reconstruct three dams destroyed by flooding.

5. This language is significant because it expressly invalidates Article II, Section 2 of the Association's bylaws. Previously, only owners who were current with the payments of fees could vote.

6. This is consistent with an implied finding of waiver and/or ratification by the owners.

of the contract. Accordingly, we find the MFA unambiguous. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). Because the question before us turns on contract construction—a question of law—we review the trial court's decision de novo. *Leander Cut Stone Co. v. Brazos Masonry, Inc.*, 987 S.W.2d 638, 640 (Tex.App.— Waco 1999, no pet.).

■■■■ In construing contractual provisions, our primary goal is to ascertain the true intentions of the parties as expressed within the "four corners" of the instrument. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex.1991). The intent that governs, however, is not the intent that the parties meant but failed to express, but the intent that is expressed. *See Altman v. Blake*, 712 S.W.2d 117, 118 (Tex.1986); *Prairie Producing Co. v. Schlachter*, 786 S.W.2d 409, 412 (Tex.App.—Texarkana 1990, writ denied); *Harlan v. Vetter*, 732 S.W.2d 390, 392 (Tex.App.—Eastland 1987, writ ref'd n.r.e.). In determining the intent of the parties, we must liberally construe the language of the restrictions in an attempt to harmonize all aspects of the instruments and give effect to all of the provisions contained therein so that none will be rendered meaningless. *Luckel v. White*, 819 S.W.2d at 462; *see Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *see also* Tex.Prop.Code Ann. § 202.003 (Vernon 1995).

■■■■ The language in Section 5 of the MFA states, in pertinent part, that maintenance charges "may be adjudged [sic] from year to year by said association as the need of the property may, in its judgment, require but in no event shall such charge be raised *unless approved by a*

*majority vote of the lot owners*" (emphasis added). Despite the contention by the owners that this language envisions a subdivision-by-subdivision vote, as held by the trial court, it is clear that the drafters' intent was to hold one vote that would be binding on all subdivisions. In fact, the introductory paragraph of the MFA states that the primary purpose of the Association is to "provide continuity and effectiveness to such *subdivision or subdivisions* ... applicable to [the first subdivision] an[d] *subsequent subdivisions* adjoining and adjacent thereto" (emphasis added). Clearly, the drafters of the MFA envisioned that the Association would exercise its enumerated powers to collect and expend maintenance fees for the benefit of any and all subdivisions as may be part of the Ivanhoe community.[7] In the interest of efficiency, as alluded to by the MFA, the drafter intended that any election for maintenance fee increases would be held for the whole of the Ivanhoe community, not in the fractured manner found by the trial court.

■■■■ Additionally, the Association contends that the proper meaning of the language in Section 5 of the MFA is that a majority of a quorum of its eligible voting members may vote to increase maintenance fees and bind all Ivanhoe lot owners.[8] In support of its argument, the Association refers to Article III, Section 5 of its bylaws which states that "the vote of a majority of the votes entitled to be cast by the members present or represented by proxy at a meeting at which a quorum is present shall be the act of the members meeting."[9] We believe this language governs the general process by which initiatives are decided by the Association and not the increase of maintenance fees, as

7. These increased fees have been applied to the common areas shared by all of the subdivisions in Ivanhoe, such as roads, dams, lakes, and parks.

8. According to Article III, Section 5 of the Association's bylaws, fifty members comprise a quorum. Thus, the Association's position is that twenty-six members, a majority of a quo-

rum, are entitled to decide what approximately one thousand lot owners are ultimately responsible for paying.

9. This language was taken verbatim from the Texas Non Profit Corporation Act. *See* Tex. Rev.Civ.Stat.Ann. art. 1396–2.12.

indicated by the total absence of any discussion in the bylaws of the specific act of increasing maintenance fees for lot owners.[10] In harmonizing the provisions of the MFA and the bylaws, it is necessary to read them together. In doing so, however, there appears to be a conflict between the specific, unambiguous voting requirements contained in the MFA for increasing maintenance fees and the more general voting requirements contained in the bylaws. Recognizing that we must reconcile such apparent conflicts and harmonize provisions so that all may be given effect, we find that the only reasonable interpretation is that the MFA must control over the bylaws on the specific issue of the manner in which elections for maintenance increases are to be conducted.

▉ The general rule is that when there is a conflict between two provisions, the specific provision controls over the general provision. *See Pilarcik v. Emmons*, 966 S.W.2d at 479; *Caldwell v. Callender Lake Prop. Owners Improvement Ass'n*, 888 S.W.2d 903, 909 (Tex.App.—Texarkana 1994, writ denied). To read the language as the Association contends would render the provisions in the MFA superfluous, a practice which our jurisprudence has traditionally prohibited. *See Luckel v. White*, 819 S.W.2d at 462; *Mercer v. Hardy*, 444 S.W.2d 593, 595 (Tex. 1969). Additionally, if any provision must be rendered meaningless, it should be the provision in the bylaws that is in irreconcilable conflict with the provisions of the MFA. *See Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex.1983); *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617 (1954).

For example, under Article II, Section 2I of the Association's bylaws, only members who are current with all fees and assessments are entitled to vote.[11] The trial court expressly invalidated this provision, finding it contrary to the voting rights to which all lot owners were entitled pursuant to the restrictive covenants contained in their deeds, as well as in the MFA.

The trial court interpreted the language in Section 5 of the MFA to mean that fees could be increased by a majority vote of those lot owners who actually vote. This interpretation, however, is inconsistent with existing precedent regarding the meaning of similar language. In *Caldwell*, a case involving identical language as we have here, we held that the term *lot owners* could not be construed to be a smaller quantum than all of the lot owners, despite language in the bylaws permitting questions to be decided by a majority vote of all lot owners voting at a meeting where a quorum is present. *Caldwell v. Callender Lake Prop. Owners Improvement Ass'n*, 888 S.W.2d at 909. Accordingly, we find that the trial court misconstrued the voting provisions in the MFA.

▉ The next series of issues involve the questions of ratification of the previous fee increases and waiver. There is uncontroverted summary judgment evidence that four of the owners served on the board of directors of the Association and seven others served on various committees. Additionally, the summary judgment evidence shows that all of the lot owners except Elizabeth Adkison, Lydia Courtney, William S. Lambert, Jr., C.A.

10. This is the extent of the contemplated interaction between the MFA and the Association, its articles of incorporation, and its bylaws, as discussed in TEX. PROP.CODE ANN. § 204.009 (Vernon Supp.2001). Subsection (b) indicates that the powers and purposes enumerated in the articles of incorporation and bylaws modify the express provisions of previously executed restrictions. However, the power to raise maintenance fees is not at issue here, only the manner in which a vote to increase said fees is to be conducted. There-fore, the modification that such an election should be held in the manner indicated by the bylaws and not the MFA is completely unwarranted. Additionally, the bylaws are not referenced in the deeds through which the owners purchased their lots, whereas the MFA is.

11. Article II, Section 2 referred to members in good standing as those who had paid all assessments, as well as other fees approved by the vote of two-thirds of a quorum.

Davis, Cecil and Sherry Odom, Robbie Broussard, D.M.D. and Dawn Clancy, Al and Bonnie Kelly, William and Marilyn Barnett, and Christopher and Jarrett Gallups, have paid the various increased fees passed by the Association over the last seventeen years. As urged by the Association, these facts could be reviewed under either the doctrine of ratification or its near relation, waiver. *Caldwell v. Callender Lake Prop. Owners Improvement Ass'n*, 888 S.W.2d at 910. In *Caldwell*, this Court held that waiver and ratification are opposite sides of the same coin.

> These two terms have been used interchangeably many times.... [R]atification and waiver invoke the same factual elements: (1)[t]here must be full knowledge of the known right which vitiates a prior act, and (2) there must be an intentional relinquishment of the known right, or intentional recognition of the prior act, depending upon the user's choice of words. While to relinquish is the gist of 'waiver' and to approve is the gist of 'ratification,' to relinquish a known right is to give validity to the prior act and to approve a prior act is to relinquish a known right.

*Caldwell v. Callender Lake Prop. Owners Improvement Ass'n*, 888 S.W.2d at 910 (quoting *Jordan v. City of Beaumont*, 337 S.W.2d 115, 118 (Tex.Civ.App.—Beaumont 1960, writ ref'd n.r.e.)).[12] We have also held that while waiver is normally considered a question of fact, it may become a question of law if the facts and circumstances are clearly established. *Id.* (citing *Shaw Equip. Co. v. Hoople Jordan Constr. Co.*, 428 S.W.2d 835, 840 (Tex.Civ.App.—Dallas 1968, no writ)). We find, however, that there are genuine issues of fact raised by the summary judgment evidence on the issues of ratification and waiver. The facts relating to which owners paid the fees and when, which owners did not pay or paid under protest, which owners were misled as to the Association's right to raise

the fees, which owners actively participated as officers or directors in the raising of the fees, and other facts relevant to waiver and ratification are not clearly established by the summary judgment evidence. Because waiver and ratification depend heavily on the intent of the parties involved, we find that fact issues on these claims need to be resolved. Therefore, we will sever those claims and remand them to the trial court for determination after the presentation of evidence.

Finally, we turn to the issue of attorney's fees. The Association has urged this Court to grant the "prevailing party" attorney's fees pursuant to Tex.Prop.Code Ann. § 5.006 (Vernon 1984). That section does not apply to the present case because we find that the owners have not breached any restrictive covenants for which attorney's fees are awarded. However, since this appeal is from a declaratory judgment action, pursuant to the Texas Uniform Declaratory Judgments Act, attorney's fees may be properly awarded as are equitable and just. Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (Vernon 1997). Accordingly, we sever the issue of attorney's fees for the owners and remand that issue to the trial court for determination.

For the reasons stated, we reverse the summary judgment granted in favor of the Association. We render judgment for the owners on the declaration of the meaning of the voting provisions in Section 5 of the MFA. We sever the issues relating to the Association's obligation to reimburse the owners for past paid fees, the collection of unpaid fees, and the issues of waiver and ratification. Those claims and issues are remanded to the trial court for trial.

---

**12.** The Texas Supreme Court has defined waiver as the intentional relinquishment of a known, existing right or intentional conduct inconsistent with claiming it. *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex.1967).