In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00118-CR


______________________________




CARLA JO KECK, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the County Court at Law No. 2


Hunt County, Texas


Trial Court No. CR0900911




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 Carla Jo Keck has filed a notice of appeal from her conviction for keeping a gambling place. 
On our review of the clerk's record, we noted that the trial court's certification of right of appeal
stated that this was a plea agreement case and that Keck has no right of appeal. 

 Unless a certification, showing that a defendant has the right of appeal, is in the record, we
must dismiss the appeal. See Tex. R. App. P. 25.2(d). 

 We sent a letter to Keck's counsel, informing him of the defect in the record and requesting
counsel to show this Court how we had jurisdiction over the appeal. Counsel has now verified that
this was a plea agreement case. 

 Because the trial court's certification affirmatively shows Keck has no right of appeal,
because Keck's counsel has verified that this was a plea bargain case, and because the record before
us does not reflect that the certification is incorrect, see Dears v. State, 154 S.W.3d 610, 615 (Tex.
Crim. App. 2005), we must dismiss the appeal.

 We dismiss the appeal for want of jurisdiction. 


 Josh R. Morriss, III

 Chief Justice


Date Submitted: July 8, 2009

Date Decided: July 9, 2009


Do Not Publish



wo, and three
could be raised without limitation as determined by the subdivision board. The lot owners challenge
this ruling in Issue Two. The trial court held that as to Sections four, five, and six, the amount of
increases in maintenance fees that could legally be imposed were limited by the deed restrictions,
but that Chapter 204 of the Texas Property Code permits Northglen to accumulate all increases
authorized  but  not  assessed  in  prior  years  and  assess  the  cumulative  total  against  the  lot
owners. This ruling is challenged in Issue One and Issue Three. The lot owners also challenge the
trial court's ruling that the board may assess fees for late payments in addition to any penalties
authorized by the restrictions. Issue Four challenges whether any additional liens authorized by
Chapter 204 of the Texas Property Code may be foreclosed against a homestead interest. Issue Five
challenges the award of attorney's fees to the lot owners if the case is reversed.

ISSUE ONE


 The trial court held that Northglen may increase the assessments for Sections four, five, and
six, without a vote of the membership, to $120.00 per lot per year, plus the increase in the consumer
price index per year or ten percent more than the prior year's assessment, whichever is greater. The
court further held that the board could accumulate the authorized but unassessed increases as allowed
by Tex. Prop. Code Ann. § 204.010(a)(16) (Vernon Supp. 2002). 

 The lot owners agree that the court properly interpreted the restrictive covenants for Sections
four, five, and six as to the allowable increases, but disagree with the court's determination that
Northglen's board had authority to accumulate and assess all increases under the authority of the
statute. The lot owners argue that the court improperly interpreted the statute, or in the alternative,
the statutory provision is unconstitutional as impairing the obligation of contracts under U.S. Const.
art. I, § 10 and Tex. Const. art. I, § 16. 

 The pertinent provision of the restrictive covenants for Section four reads as follows:

 Until January 1 of the year immediately following the conveyance of the first Lot to
an Owner, the maximum annual assessment shall not exceed Ten ($10.00) Dollars
per  month,  or  One  Hundred  Twenty  ($120.00)  Dollars  per  annum,  per  Lot: 
provided, however, that from and after January 1 of the year immediately following
the conveyance of the first Lot to an Owner, the Board of Directors of the
Association shall be empowered to increase said rate as the needs of the Association
require; except that if any such increase shall cause the annual assessment to be
greater than the aforesaid $120.00 plus the rise, if any, of the Consumer Price Index
as published by the United States Department of Labor for the preceding month of
July; or more than One Hundred Ten (110%) percent of the amount assessed in the
preceding calendar year, whichever is greater, then shall such an increase require the
vote of two-thirds (2/3) of each class of members of the Association who are voting
in person or by proxy, at a meeting duly called for that purpose.

 

 The provisions for Sections five and six are substantially the same. The lot owners contend
that if the assessments are accumulated under Tex. Prop. Code Ann. § 204.010 (Vernon Supp.
2002), it would allow an increase of at least ten percent for every year the deed restrictions were in
force (sixteen years) with interest compounded. They contend this would permit the annual
assessment for these sections to increase from $120.00 per lot per year to more than $550.00. 



 Tex. Prop. Code Ann. § 204.010 provides, in pertinent part, as follows:

 (a) Unless otherwise provided by the restrictions or the association's
articles of incorporation or bylaws, the property owners' association,
acting through its board of directors or trustees may:

 . . . .

 (16) if the restrictions allow for an annual increase in the maximum
regular assessment without a vote of the membership, assess the
increase annually or accumulate and assess the increase after a
number of years.

 

 Reading the plain language of the statute and the pertinent portions of the restrictive
covenants for Sections four, five, and six, we agree with the trial court's determination. The
restrictions for these sections do not expressly "provide otherwise" to the statutory authorization, so
accumulation of the previously authorized but unassessed annual increases is allowed. The phrase
"unless otherwise provided" or similar language, when used in a statute, usually refers to other
statutes pertaining to the same subject matter. Here we construe the language to refer to other
statutes on the same subject matter, or to agreements or restrictions applicable to the subdivision. 
We can find no instance where silence on the subject has been construed as "otherwise providing." 
The lot owners argue that the original provision allowing for the assessments and the annual
increases in itself is an exclusive method of making the assessments and increases, and so it
effectively "provides otherwise" to the statutory provision authorizing accumulation. We disagree. 
The deed restrictions in no way either authorize or prohibit accumulation. They are completely silent
on that subject. As we have already noted, we do not believe that silence on the subject of
accumulation may reasonably be construed to be a positive or express provision that accumulation
is not permitted. Indeed, it seems that if the Legislature had thought that the original assessment
provision itself denied the authority to accumulate, it would not have used the phrase "unless
otherwise provided" in the statute authorizing accumulation. That the Legislature felt it necessary
to use these words indicates, we think, that it did not believe that the bare provision for annual
assessments necessarily prohibited accumulation.

 The lot owners argue that if Chapter 204 of the Texas Property Code gives homeowners'
associations authority to accumulate and assess maintenance fees where the original deed restrictions
do not, the statute would be unconstitutional as a retroactive law and because it impairs the
obligation  of  contracts  in  violation  of  Article  I,  §  10  of  the  United  States  Constitution  and
Article I, § 16 of the Texas Constitution. 

 Article I, § 10 of the United States Constitution provides:

 No State shall enter into any Treaty, Alliance, or Confederation; grant
Letters of Marque and Reprisal; coin Money; emit Bills of Credit;
make any Thing but gold and silver Coin a Tender in Payment of
Debts; pass any Bill of Attainder, ex post facto Law, or Law
impairing the Obligation of Contracts, or grant any Title of Nobility.


 Article I, § 16 of the Texas Constitution provides:


 No bill of attainder, ex post facto law, retroactive law, or any law
impairing the obligation of contracts shall be made.



 Although both the United States and Texas Constitutions prohibit laws that impair the
obligation of contracts, it is now well settled that state police power regulations dealing with physical
things such as land or natural resources are valid even if they have incidental effects on pre-existing
contracts, if those laws or regulations are exercised in the interest of the public welfare. Barshop v.
Medina County Underground Water Conservation Dist., 925 S.W.2d 618 (Tex. 1996). As stated
by the United States Supreme Court in Henderson v. Thompson, 300 U.S. 258, 57 S.Ct. 447, 81
L.Ed. 632 (1937), the Texas Constitution has never been held to invalidate a police power statute
dealing directly with physical things in the interest of the public welfare that touch only indirectly
on contractual relationships that attached to those physical things before the statute or regulation was
enacted. In so holding, the United States Supreme Court distinguished the Texas Supreme Court
case of Travelers Ins. Co. v. Marshall, 124 Tex. 45, 76 S.W.2d 1007 (1934), by pointing out that in
that case the law directly affected contracts by placing a moratorium on their enforcement. So the
law involved in Travelers v. Marshall did not merely incidentally affect a contractual provision
relating to specific physical things, but directly and explicitly abrogated specific provisions of pre-existing contracts. Subsequent to the decision in Travelers v. Marshall, Texas courts have
consistently followed the reasoning set out in Henderson v. Thompson. See Barshop v. Medina
County Underground Water Conservation Dist., 925 S.W.2d 618; Tex. Water Comm'n v. City of Fort
Worth, 875 S.W.2d 332 (Tex. App.-Austin 1994, writ denied); Tex. State Teachers Ass'n v. State
of Texas, 711 S.W.2d 421 (Tex. App.-Austin 1986, writ ref'd n.r.e.); Kilpatrick v. State Bd. of 
Registration for Prof'l Eng'rs, 610 S.W.2d 867 (Tex. Civ. App.-Fort Worth 1980, writ ref'd n.r.e.); 
Andrada v. City of San Antonio, 555 S.W.2d 488, 491 (Tex. Civ. App.-San Antonio 1977, writ
dism'd); State Bd. of Registration for Prof'l Eng'rs v. Wichita Eng'g Co., 504 S.W.2d 606 (Tex. Civ.
App.-Fort Worth 1973, writ ref'd n.r.e.); Dovilina v. Albert, 409 S.W.2d 616 (Tex. Civ.
App.-Amarillo 1966, writ ref'd n.r.e.). As noted by the court in Andrada v. City of San Antonio, 555
S.W.2d at 491, and as quoted from the opinion in Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127,
50 L.Ed. 274 (1905), "The interdiction of statutes impairing the obligation of contracts does not
prevent the State from exercising such powers as are vested in it for the promotion of the common
weal, or are necessary for the general good of the public, though contracts previously entered into
between individuals may thereby be affected . . . in other words, . . . parties, by entering into
contracts may not estop the Legislature from enacting laws intended for the public good."

 Here, Section 204.010 of the Texas Property Code is not directed to any specific kind of
contracts, and it does not directly contradict any contractual provision prohibiting the accumulation
of assessments. Indeed, it expressly does not authorize accumulation of assessments if the applicable
agreements provide otherwise. Therefore, in authorizing the accumulation of assessments it does
not impair the obligation of the homeowners' agreements with the subdivisions in the constitutional
sense.

 The lot owners argue that the statutory provisions of Chapter 204 do not pertain to physical
things and were not enacted to promote the common good under the police power, and therefore 
they violate the provisions against the impairment of contracts. We disagree. Zoning regulations
affecting residential subdivisions as well as commercial developments are proper exercises of the
police power and are valid even though they may affect or modify the provisions of previously
executed contracts. See Biddle v. Bd. of Adjustment, 316 S.W.2d 437 (Tex. Civ. App.-Houston
1958, writ ref'd n.r.e.). Although Chapter 204 is not a zoning ordinance, it was enacted to promote
the public welfare with regard to the property owners associations' ability to better provide services
to the homeowners, maintain the common area facilities, and provide for the common security and
restriction enforcement. Section 1(b)(3), (4) of the Statement of Legislative Policy (1) provides, for
example: 

 (3) it is in the best interest of residential real estate subdivisions that a procedure be
available to readily facilitate increases in the amount of the regular or special
assessments to allow the property owners' associations to better provide services to
the subdivisions; and (4) restrictions that severely limit the amount of the regular
assessment may result in the inability of an ineffective property owners' association
to maintain common area facilities, including swimming pools, tennis courts,
clubhouses, greenbelt areas, or jogging trails, or to provide services, including
streetlights, security, architectural control, and deed restriction enforcement.


We must initially presume that a legislative enactment is constitutional. Barshop v. Medina County
Underground Water Conservation Dist., 925 S.W.2d at 629. The Texas Property Code, Section
204.010, provides that public policy considerations require the adoption of the procedure allowing
the modification of existing property restrictions in residential subdivisions. As this statute is an
expression of public policy for the promotion of the public welfare, and only incidentally affects
pre-existing contracts, we find that it does not violate the United States or Texas Constitutional
provisions prohibiting laws that impair the obligation of contracts. For the same reasons, we find
that Chapter 204 is not unconstitutional as a retroactive law.

 The lot owners mention in their brief that Chapter 204 may offend the due process and equal
protection clauses, but the issue is not briefed so we will not consider it.

ISSUE TWO
 

 The lot owners contend the trial court erred in holding that the restrictions for Northglen
Sections one, two, and three permit the association's board to increase the annual assessments
without limitation and without a vote of the lot owners. 

 Restrictive covenants for residential subdivisions are subject to general rules of contract
construction. Pilarcik v. Emmons, 966 S.W.2d 474, 478 (Tex. 1998). Whether the restrictions are
ambiguous is a question of law for the court to determine. An ambiguity is not present simply
because the parties advance conflicting interpretations of the restrictions. No party here contends
the restrictions are ambiguous. Because the interpretation of the restrictions turns on contract
construction-a question of law-we review the decision of the trial court de novo. Ostrowski v.
Ivanhoe Prop. Owners Improvement Ass'n, 38 S.W.3d 248, 252-53 (Tex. App.-Texarkana 2001, 
pet. denied); Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A., 956 S.W.2d 749, 752 n.1
(Tex. App.-Houston [14th Dist.] 1997, pet. denied). 

 We recognize several principles of contract construction as being applicable to this dispute. 
Our primary concern is to give effect to the written expression of the parties' intent. The contract
must be considered as a whole, and each part of the contract should be given effect. Forbau v. Aetna
Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994). It is the intent, expressed or apparent, in the writing
that is controlling. New Caney Indep. Sch. Dist. v. Burnham AutoCountry, Inc., 30 S.W.3d 534, 539
(Tex. App.-Texarkana 2000, pet. denied). A restrictive covenant must be liberally construed to give
effect to its evident purpose and intent. Tex. Prop. Code Ann. § 202.003(a) (Vernon 1995);
Benard v. Humble, 990 S.W.2d 929 (Tex. App.-Beaumont 1999, pet. denied); Candlelight Hills
Civic Ass'n v. Goodwin, 763 S.W.2d 474, 477 (Tex. App.-Houston [14th Dist.] 1988, writ denied).

 As to Northglen Section one, the pertinent language of the assessment provision is 

 

as follows:

 2. Annual Assessment or Charge. Each Lot in said Subdivision,
when said Lot is certified by the Subdivision Engineer to be a
completed building site, is hereby subjected to an annual maintenance
charge and assessment not to exceed $10 per month or $120 per
annum, for the purpose of creating a fund to be designated and known
as the "maintenance fund," which maintenance charge and assessment
will be paid by the Owner or Owners of each Lot within said
Subdivision, and any annexed areas, to Northglen Association in
advance, annually, commencing as to all Lots on the first day of each
month following their certification of completion. The rate at which
each Lot will be assessed will be determined annually by the Board
of Directors of Northglen Association at least thirty (30) days in
advance of each annual assessment. Said rate and when the same is
payable may be adjusted from year to year by said Board of Directors
as the needs of the Subdivision may in the judgment of the Directors
require. 

 As to Northglen Section two, the pertinent language of the assessment provision is as
follows:

 2. Annual Assessment or Charge. Each Lot in said Subdivision,
when said Lot is certified by the Subdivision Engineer to be a
completed building site, is hereby subjected to an annual
maintenance charge and assessment not to exceed $10 per month or
$120 per annum, for the purpose of creating a fund to be designated 
and known as the "maintenance fund," which maintenance charge and
assessment will be paid by the Owner or Owners of each Lot within
said Subdivision, and any annexed areas, to Northglen Association in
advance annually, commencing as to all Lots on the first day of the
month following their certification of completion. The rate at which
each Lot will be assessed will be determined annually by the Board
of Directors of Northglen Association at least thirty (30) days in
advance of each annual assessment. Said rate and when same is
payable may be adjusted from year to year by said Board of Directors
as the needs of the Subdivision may in the judgment of the Directors
require.


 Although the trial court's reasoning is not set forth in its findings of fact or its judgment, its
ruling that Northglen's board of directors has unlimited authority to raise the annual maintenance
assessment against each lot violates the principles of contract construction by which we are bound. 
We may not consider only the language in the restriction that permits the board to determine annually
the rate at which each lot shall be assessed and simply ignore the language providing that the
assessment shall not "exceed $10.00 per month or $120.00 per annum." Northglen contends that the
stated limit, not to exceed $120.00 per lot per year, is applicable only until the "maintenance fund"
referred to therein is fully funded, and after that occurs, the board has unlimited authority to
determine additional maintenance assessments as it sees fit. The effect of this reasoning, however, 
would be to create two separate funds: one, the maintenance fund, limited to a maximum of $120.00
per lot per year; and two, another fund whose sources of revenue would be any amount assessed by
the board and collected from the lot owners over and above the maintenance fund amount. 

 The quoted language and language from other parts of the restrictions simply will not support
such a construction. The language can only be reasonably read as creating one fund, the
"maintenance fund." There was no evidence before the trial court that Northglen keeps two separate
maintenance funds. Further, in another part of Section two's restrictions, in which disbursement of
the funds collected by the association is authorized, the language clearly refers to only one fund from
which the association's expenditures are authorized. See, for example, subsequent language from
Article VI. (2), for Section 2:

 Northglen Association shall use the proceeds of said maintenance fund for the use
and benefit of all residents of said Subdivision, as well as those of all subsequent
sections of the Subdivision annexed as hereinafter set forth. Such uses and benefits
to be provided by said Association may include, by way of clarification and not
limitation, any and all of the following: acquisition, construction and maintaining
parks, parkways, rights-of-way, easements, esplanades and other public areas; 
supervising and contracting for the collection and disposition of garbage, ashes,
rubbish and the like; maintenance of any Common Area; payment of all legal charges
and expenses in connection with the enforcement of all recorded charges and
assessments, covenants, restrictions and conditions affecting said property . . . .


The language permits expenditures for the stated purposes only from the proceeds of the "said
maintenance fund," and not from any other source. The language does not authorize collection of
or disbursement of any other fund for subdivision purposes.

 Further, consistent with our obligation to give effect to all of the contract's terms, we may
not ignore the "not to exceed" language that imposes a limitation of the amount of assessments the
association may assess. The maintenance fund assessments may not exceed $120.00 per lot per
year. (2) The trial court's judgment in this regard simply ignores the contractual limitation. Such a
result cannot be reconciled with the language of the restrictions. 

 We disagree with the decision of the court in Samms v. Autumn Run Cmty. Improvement
Ass'n, 23 S.W.3d 398 (Tex. App.-Houston [1st Dist.] 2000, pet. denied). One of the issues in that
case was the authority of the association to increase annual maintenance charges in the subdivision. 
The assessment provision in the restrictions involved in that case were almost identical to those here
as they pertain to Sections one and two. In determining that the assessment provision gives the
association the right to change the annual assessment every year as it sees fit, the court set out a
portion of the provision emphasizing the language that allows an annual determination by the board
of the rate at which each lot will be assessed, and that allows the board to adjust the rate from year
to year as the needs of the subdivision may, in the board's judgment, require. Although the language
emphasized by the court, standing alone, would support its conclusion, the court ignored other
language, including the "not to exceed" language in the same paragraph. The opinion also fails to
consider that the effect of its ruling is to create two maintenance funds and another account of any
amount over the "fully established" maintenance fund, which is nowhere authorized by the
restrictions set out in the opinion. 

 As we noted earlier, in view of the "not to exceed" language, the evident intent of the
restrictions to establish only one maintenance fund, and the specific language limiting authorized
expenditures for subdivision purposes to the maintenance fund, we conclude that the restrictions in
our case do not permit unlimited increases in the rate at which each lot may be assessed. We are not
permitted to isolate certain passages from the restrictions, emphasize them, and conclude to the
contrary. We therefore conclude that the trial court erred in this regard.

 In making our conclusion that the restrictions for Sections one and two do not allow the
association to raise the assessments above the "not to exceed" figure of $120.00 annually, we are not
ignoring the language that allows the board to adjust the rate of the assessments from year to year. 
Rather, we construe this particular language to mean that the board may adjust the amount of the
assessments within the "not to exceed" amount, and adjust and set the time when such assessments
may be due.

 In the Section three restrictions, the draftsman employed the same "not to exceed" language,
i.e., that each lot in the section is subjected to an annual maintenance assessment not to exceed
$10.00 per month or $120.00 per annum, for the purpose of creating a fund to be designated and
known as the maintenance fund. The restrictions contain language authorizing the board to increase
the maintenance charge as the needs of the subdivision require, but limits any increases in the annual
assessment rate to ten percent per annum unless approved by a majority of both classes of
membership voting at a meeting called for that purpose. The restrictions also state that the
association shall "use the proceeds of said maintenance fund for the use and benefit of all residents
of said Subdivision . . . ." 

 Again, giving effect to all the language contained in the restrictions, we conclude that the
intent is to limit the assessments to a maximum of $120.00 per lot per year, and that more than a ten
percent increase per year would require approval of the lot owners at a meeting called for that
purpose. The lot owners' Issue Three is sustained as to Section three of Northglen. 

 Northglen contends that the Texas Property Code permits it to increase the maintenance
assessment notwithstanding the limitations contained in the restrictions. As we have previously
noted, Tex. Prop. Code Ann. § 202.003(a) requires a liberal construction of the provisions of
restrictive covenants. Northglen points out that the stated legislative policy that precipitated the
enactment of Chapter 204 of the Texas Property Code, combined with the required liberal
interpretation of the restrictions, gives it the right to increase maintenance fees without the prior
approval of the lot owners. In enacting what would become Chapter 204, the Legislature specifically
set out its policy determination:

 (a) Public policy considerations require that a procedure be available to allow for the
extension of, addition to, or modification of existing property restrictions in
residential real estate subdivisions.

 

 (b) The legislature finds that:

 

 (1) property owners' associations serve to benefit residential real estate
subdivisions and assist in avoiding the problems described by Section 201.002,
Property Code;

 (2) there is a special relationship between property owners' associations and
the property owners within the subdivision;

 (3) it is in the best interest of residential real estate subdivisions that a
procedure be available to readily facilitate increases in the amount of the regular or
special assessments to allow the property owners' associations to better provide
services within the subdivisions; and 

 (4) restrictions that severely limit the amount of the regular assessment may
result in the inability of an ineffective property owners' association to maintain
common area facilities, including swimming pools, tennis courts, clubhouses,
greenbelt areas, or jogging trails, or to provide services, including streetlights,
security, architectural control and deed restriction enforcement.

 

 (c) The purpose of this Act is to:

 

 (1) provide a less burdensome procedure for extending the term of, adding to
or modifying residential real estate restrictions by approval and circulation of a
petition by a property owners' association.

 

Tex. Prop. Code Ann. § 204.001 historical note (Vernon Supp. 2002) (emphasis added) [Act of
May 27, 1995, 74th Leg., ch. 1040, § 2, 1995 Tex. Gen. Laws 5170-5175].

 Subsection (c)(1) specifically states that the purpose of the act is to provide a less
burdensome procedure for changing or adding to restrictions, which is by approving and circulating 
a petition. Further, we emphasized the phrase "extending the term of, adding to or modifying"
because that or a similar phrase is used in subsequent sections of Chapter 204. For example, Section
204.003:

 An express designation in a document creating restrictions applicable to a residential
real estate subdivision that provides for extension of, addition to, or modification of
existing restrictions by a designated number of owners of real property in the
subdivision prevails over the provisions of this chapter.

 

Tex. Prop. Code Ann. § 204.003 (Vernon 1995) (emphasis added). This section was addressing
the problems recognized in Section 1(a) of the legislative policy statement, i.e., extending,
modifying, or adding to existing restrictions. It specifically states that if such procedures are
provided in the restrictions, they prevail over this chapter. The same phrase appears again in Tex.
Prop. Code Ann. § 204.005 (Vernon Supp. 2002), both in the title of the section, "Extension of,
Addition to, or Modification of Existing Restrictions," and, more importantly, in the language of the
statute itself:

 (a) A property owners' association has authority to approve and circulate a petition
relating to the extension of, addition to, or modification of existing restrictions. A
property owners' association is not required to comply with Sections 201.009-201.012. 

 (b) A petition to extend, add or modify existing restrictions approved and circulated
by a property owners' association is effective if:

 . . . .

 (e) A property owners' association that circulates a petition must notify all record
owners of property in the subdivision in writing of the proposed extension, addition
to, or modification of the existing restrictions . . . .

(Emphasis added.)

 It is apparent that Section 204.005 of the Texas Property Code intends to address the problem
of the extension, addition, or modification to existing subdivision restrictions by providing an
alternative means, i.e., the circulation of a petition, by which such restrictions may be amended. The
statute also sets forth how to handle the situation of multiple sections of a subdivision and what type
of notice is necessary to the lot owners. The language of Section 204.005 will not support an
interpretation that would permit increasing maintenance fees in direct contravention of limitations
specifically set out in the restrictions. If the Legislature in this statute intended to grant homeowners'
associations the authority simply to increase assessments above limitations stated within the
restrictions, without some kind of amending procedure, there would be no need to place in the statute
the mechanism for circulating a petition. 

 We hold that, regarding Northglen Sections one, two, and three, neither the language of the
restrictions nor the provisions of Chapters 202 and 204 of the Texas Property Code permit the
association's board to increase the per lot per year assessment above $120.00, unless the restrictions
are amended as provided in the covenant, or as provided by the modified amendment procedure set
forth in Chapter 204.

ISSUE THREE


 The lot owners contend that the trial court erred in ruling that Northglen, without a vote by
the homeowners, is authorized to impose a charge of $35.00 on late payments of maintenance fees. 
The trial court ruled that the board may charge late fees in addition to interest because the provision
of the bylaws that imposes a penalty on late payments does not expressly prohibit late fees. The trial
court relied on Tex. Prop. Code Ann. § 204.010(a)(10) (Vernon Supp. 2002), which permits a
homeowners' association to impose interest, late charges, and returned check charges unless
otherwise provided by the restrictions or the association's bylaws or articles of incorporation. 

 Northglen's original bylaws permitted it to charge interest of six percent per annum on
maintenance fees not paid within thirty days after the due date. The bylaws were subsequently
modified to permit the imposition of the late charge against any assessment that is not paid within
thirty days after the due date. 

 The lot owners contend that the authority of Tex. Prop. Code Ann. § 204.010 is limited to
default situations, i.e., when no other provision is made regarding the subject matter of the statute.
We do not agree. There is no case authority to support the argument that silence on the subject
matter is considered to "otherwise provide." The bylaws in question do not specifically limit the
penalties for late payment to the imposition of six percent interest; they further do not forbid the
imposition of a late charge. This is an area in which the bylaws and restrictions have not otherwise
provided, and the plain language of Tex. Prop. Code Ann. § 204.010(a)(10) permits a late charge.
Where there is no specific prohibition against an action of the association, the rule of liberal
construction permits the association to take action that is necessary or desirable for the good of the
subdivision. Candlelight Hills Civic Ass'n, v. Goodwin, 763 S.W.2d at 478-79. The resolution that
imposed the late charge made a finding that late payments adversely affected the association's ability
to carry out its duties. The lot owners have raised no challenge to this factual determination by the
board. This issue is overruled. 

ISSUE FOUR


 The lot owners contend that if Chapter 204 of the Texas Property Code is construed to
authorize the imposition of charges that are not found in the restrictive covenants themselves, the
trial court should have declared that nonpayment of such new charges does not authorize the
homeowners' association to foreclose on homesteads for default in such payments. 

 The authority to foreclose on homesteads for nonpayment of subdivision maintenance dues
was first enunciated by the Texas Supreme Court in Inwood N. Homeowners' Ass'n v. Harris, 736
S.W.2d 632 (Tex. 1987). Notwithstanding the constitutional recognition of the sanctity of the
homestead and its immunity from most liens, the Court found that the characteristics of such
assessments met the requirements for liens enforceable through foreclosure against homesteads for
two reasons: 1) the assessments were covenants running with the land; and 2) the homestead
exemption does not operate to circumvent and avoid an inherent characteristic of the property
acquired. 

 One of the requirements for a valid covenant running with the land is notice to the person
acquiring the property. Inwood N. Homeowners' Ass'n v. Harris, 736 S.W. 2d at 635. The Texas
Supreme Court in Inwood North found that the purchasers of property in the subdivision were bound
by the terms of the instruments in their chains of title that contained the restrictions, and that the
deeds acquired by each of them gave notice of their obligations. The Court stated:

 Thus, this case revolves around when the lien attached on the property. If it occurred 
 simultaneously to or after the homeowners took title, there is authority which would
deem the homestead right superior. On the other hand, if the lien attached prior to
the claimed homestead right and the lien is an obligation that would run with the
land, there would be a right to foreclose.

 

Id. at 635 (citations omitted). 

 The lot owners rely on Op. Tex. Att'y Gen. No. 97-019 (1997), which concluded that costs
imposed by a subdivision board pursuant to Chapter 204 of the Texas Property Code, but not
authorized by the restrictive covenants themselves at the time of the acquisition by the homeowners,
did not create a lien that would precede a homestead right dating from before the board's actions. 
The opinion cited dicta from Boudreaux Civic Ass'n v. Cox, 882 S.W.2d 543, 547 (Tex.
App.-Houston [1st Dist.] 1994, no writ), suggesting that if an amendment to the restrictions creates
a new lien subject to a homestead declaration, it is not enforceable; if it is a modification to an
existing lien, it would be enforceable through foreclosure. 

 In Davis v. Huey, 620 S.W.2d 561 (Tex. 1981), the Texas Supreme Court held that
architectural restrictions imposed by a restrictive covenant were enforceable only if the purchaser
acquired his property with constructive notice of such restrictions. The Court said it was essential
that the purchaser-landowner have notice on the limitations on his title. 

 Based on those authorities, we conclude that any new type of assessment, late charge, or
attorney's fee that is imposed solely through the authority of Chapter 204 of the Texas Property Code
cannot be enforced by foreclosure against a homestead. In addition, a subdivision assessment within
the limit authorized by the restrictive covenant could be enforced through foreclosure against a
homestead because it would be the requisite covenant running with the land affixed to the property
before the owner acquired it. If a fee or charge is imposed solely because of the provisions of
Chapter 204 after an owner acquired his homestead interest, the requisite notice necessary for a
covenant running with the land would be lacking, and the lien would be inferior to the homestead. 
This would include: (1) the late charges to which we referred earlier in the opinion; (2) any
increased assessments or fees in excess of that allowed by the original restrictions; and (3) any
accumulated or increased fees authorized solely by Chapter 204. If the amount is increased through
the proper amendment procedure, there would be a modification of the contract with the subdivision
association, and the agreed modification would be subject to enforcement through foreclosure,
because there would be the required notice or constructive notice. 

ISSUE FIVE 


 The lot owners suggest that if we rule in their favor, we should award them attorney's fees. 
In the judgment we render, neither side would be considered a prevailing party. Tex. Prop. Code
Ann. § 5.006 (Vernon 1984). The trial court, acting within its discretion, did not award attorney's
fees. Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 1997); see Ostrowski v. Ivanhoe Prop.
Owners Improvement Ass'n, 38 S.W.3d at 255. We affirm the determination of the trial court
regarding attorney's fees.

 For the reasons stated, we affirm the judgment of the trial court as to Issues One, Three, Four
and Five. As to Issue Two, we reverse the trial court's judgment and render judgment that Northglen
may not increase the annual assessments for Sections one, two, and three above that provided in the
deed restrictions unless authorized by vote of the lot owners.


 William J. Cornelius

 Chief Justice






DISSENTING OPINION


 I strongly dissent from the majority decision allowing the homeowner's association to
accumulate unassessed tax increases in direct violation of the covenants on the property. Section
204.010(a)(16) of the Texas Property Code is a provision allowing increases, but Section 204.010(a)
conditions all such increases on the following language: "Unless otherwise provided by the
restrictions . . . ." Tex. Prop. Code Ann. § 204.010 (Vernon Supp. 2002). The provisions of the
restrictive covenants (Section 4) in this case clearly provides otherwise.

 The provision includes the following language "except that if any such increase shall cause
the annual assessment to be greater than the aforesaid $120.00 plus the rise, if any, of the Consumer
Price Index as published by the United States Department of Labor for the preceding month of July;
or more than One Hundred Ten (110%) percent of the amount assessed in the preceding calendar
year, whichever is greater, then shall such an increase require the vote of two-thirds (2/3) of each
class of members of the Association who are voting in person or by proxy, at a meeting duly called
for that purpose."

 This restriction does more than just allow an annual increase up to the maximum without a
vote of the membership, it specifically limits that increase to a percentage of the increase "assessed
in the preceding calendar year." Furthermore, the provision specifically provides that if the
percentage is greater than the percentage of the increase assessed in the preceding year by a certain
percentage, then two-thirds of each class of members of the association must vote for such an
increase. There was not a two-thirds vote for such an increase.

 Allowing the accumulation in spite of this provision is to defy and ignore the legislative
mandate which allows such accumulation only in the event it is not otherwise provided by the
restrictions.






 I do not believe such interpretation was the intent of the Legislature, those agreeing to and

accepting the restrictions, and the plain language of the statute and the restrictions.



 Ben Z. Grant

 Justice


Date Submitted: February 27, 2002

Date Decided: April 18, 2002


Publish
1. Tex. Prop. Code Ann. § 204.001 statutory note (Vernon Supp. 2002) [Act of May 27,
1995, 74th Leg., ch. 1040, § 1, 1995 Tex. Gen. Laws, 5170, 5171].
2. State ex rel. Roth v. Bookhart, 586 P.2d 382 (Or. Ct. App. 1978), involved a "wage
assignment" (compare to a garnishment) imposed on an individual to insure payment of delinquent
child support payments. The applicable statute limited the amount of a person's wages that may be
"assigned" for such purposes to an amount "not to exceed" one fourth of the individual's disposable
earnings. The Oregon Court of Appeals construed the phrase "not to exceed" to mean that the trial
court had no discretion to set the amount of wages assigned any higher than the specified amount.
Id. at 386.